Appeal No. 2015-1544, -1550, -1551

---

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

---

WORLDWIDE HOME PRODUCTS, INC.,
*Plaintiff*

v.

TIME, INC., BED BATH & BEYOND, INC.,
COHESION PRODUCTS INC., SHERRY HANSON,
*Defendants-Appellees*

v.

JEFFREY SONNABEND,
*Movant-Appellant*

---

Appeals from the United States District Court for the
Southern District of New York in No. 1:11-cv-03633-LTS-MHD,
Judge Laura Taylor Swain

---

BRIEF OF MOVANT-APPELLANT JEFFREY SONNABEND

Jeffrey Sonnabend
SonnabendLaw
600 Prospect Avenue
Brooklyn, NY 11215
718-832-8810
jsonnabend@sonnabendlaw.com

June 18, 2015

## CERTIFICATE OF INTEREST

In compliance with Federal Circuit Rule 47.4(b), counsel for the Movant-Appellant Jeffrey Sonnabend certifies the following:

1. The full name of every party or amicus represented by me is: Jeffrey Sonnabend (*pro se*).

2. The real name of the real party in interest (if the party name in the caption is not the real party in interest) represented by me is: None.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are: Jeffrey Sonnabend (*pro se*).

i

## STATEMENT OF RELATED CASES

There are no non-consolidated, related cases.

Previously related and consolidated cases 2015-1461 and 2015-1655 were dismissed on consented motion by order dated June 18, 2015.

# TABLE OF CONTENTS

I      **JURISDICTIONAL STATEMENT** ...................................................1

II     **STATEMENT OF THE ISSUES** ................................................1

III    **STATEMENT OF THE CASE**....................................................1

IV    **STATEMENT OF THE FACTS**...................................................3

    A    **The Prosecution Of The Application For The '300 Patent**..............3

    B    **The Non-Prior Art Merrick Hanger Product**...................................6

    C    **Summary Judgment And Confirmation Of The Non-prior Art Status Of The Merrick Hanger Product**...........................................8

V     **SUMMARY OF THE ARGUMENT**.........................................10

VI    **STANDARD OF REVIEW** ........................................................12

VII   **ARGUMENT**............................................................................13

    A    **The Imposition Of Sanctions Was Premised Entirely On The Trial Court's Finding Of Inequitable Conduct, And So The Sanctions Must Be Reversed Because The Inequitable Conduct Finding Is Wrong**..................................................................................13

    B    **The Trial Court's Inequitable Conduct Finding Is Clearly Erroneous And Must Be Reversed**...................................................16

        1    **The Trial Court's Ruling On Materiality Was Wrong**........17

            a    **The Trial Court Failed To Analyze "But For" Materiality, And Thus Erred In Finding Materiality**17

            b    **The Withheld Information Did Not Concern Prior Art, So It Could Not Be "But For Material"**..............22

c     There Were No "Statements" At All, So There Could Not Have Been "Material Misrepresentations" In Any Such Statements..................................................26

2     The Trial Court Erred In Finding Intent............................28

a     The Trial Court Incorrectly Discounted Attorney Sonnabend's Reasonable Explanation For Withholding Information About The Non-Prior Art C90610 Hangers..........................................................28

b     The Trial Court Reached Its Conclusion Of Intent To Deceive By Selectively Ignoring The Record.............31

c     The Trial Court Erred By Finding Intent Because It (Incorrectly) Found Attorney Sonnabend's Legal Position Flawed..........................................................34

C     The Trial Court Was Wrong To Admit And Rely On The Poms Report..................................................................38

VIII   CONCLUSION.......................................................................41

# TABLE OF AUTHORITIES

Cases

*1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d 1367, 1372 (Fed. Cir. 2012),............13

*American Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1335 (Fed. Cir. 2011)....................................................................................................................20, 21

*American Calcar, Inc. v. American Honda Motor Co.*, 768 F.3d 1185, 1189 (Fed. Cir. 2014)....................................................................................................12, 18, 21

*Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 260 Fed.App'x. 284, 291 (Fed. Cir. 2008)..................................................................................................................22

*Bone Care Int'l LLC v. Pentech Pharmaceuticals, Inc.*, 2010 WL 3928598 at * 9 (N.D. Ill. Oct. 1, 2010)..........................................................................................40

*Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 160 (2d Cir. 2012). .11

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 2799, 125 L. Ed. 2d 469 (1993)..................................................................38-39, 41

*Glaxo Grp. Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1346 (Fed. Cir. 2004).............10, 13

*Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988)......................................................................................................................38

*Leviton Mfg. Co. v. Universal Sec. Instruments, Inc.*, 606 F.3d 1353, 1358 (Fed. Cir. 2010)............................................................................................................11, 15

*Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390 (Fed. Cir. 2003).............11

*Network Signatures, Inc. v. State Farm Mut. Auto. Ins. Co.*, 731 F.3d 1239, 1242 (Fed. Cir. 2013)............................................................................................11, 17

*Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005)..............................38

*Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 940 (Fed Cir. 1990).....23

*Nystrom v. TREX Co.*, 424 F.3d 1136, 1141 (Fed. Cir. 2005)...........................10, 14

*Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1344 (Fed. Cir. 2013)......16

*Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1290 (Fed. Cir. 2012)................................................................................................16, 38

*People of State of N.Y. by Vacco v. Operation Rescue Nat.*, 80 F.3d 64, 72 (2d Cir. 1996)..............................................................................................11, 14

*Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 31 F. App'x 727, 732 (Fed. Cir. 2002).......................................................................................................22

*Se-Kure Controls, Inc. v. Diam USA, Inc.*, 2009 WL 77463 at *2 (N.D. Ill. Jan. 9, 2009)..........................................................................................................39

*Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1364 (Fed. Cir. 2008)........................................................................................................21

*Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc)................................................................................................*passim*

*United States v. Cramer*, 777 F.3d 597, 601 (2d Cir. 2015)...................................13

*Vincenty v. Bloomberg*, 476 F.3d 74, 83 (2d Cir. 2007)..........................................14

Statutes and Rules

35 U.S.C. §§ 102...................................................................................18, 21

35 U.S.C. §§ 103...................................................................................18, 21

37 C.F.R. § 1.56............................................................................................19

Fed. R. Evid. 702.........................................................................................39

# I    JURISDICTIONAL STATEMENT

The district court's Judgment was entered on February 11, 2015, and is a final judgment that disposes of all claims and counterclaims. The district court's order regarding attorneys' fees and sanctions was entered on April 9, 2015. The Court of Appeals for the Federal Circuit has jurisdiction over this appeal under 28 U.S.C. § 1295(a)(1).

Appellant timely filed its Notice of Appeal on April 10, 2015.

# II    STATEMENT OF THE ISSUES

1. Whether the award of sanctions against Attorney Sonnabend, based on a finding of inequitable conduct, was correct;

2. Whether the finding of inequitable conduct underlying the award of sanctions against Attorney Sonnabend was correct; and

3. Whether the admission of the expert report and testimony of Defendants' expert, William Poms, and the reliance on the same by the trial court in the finding of inequitable conduct against Attorney Sonnabend, was correct.

# III    STATEMENT OF THE CASE

The present case concerns a patent infringement suit brought by Worldwide Home Products, Inc. ("Worldwide") against Bed Bath and Beyond, Inc. and its vendor, Cohesion Products, Inc. (collectively, "Defendants")[1]. The patent-in-suit,

---

[1] The suit originally name two additional parties, both of whom were dismissed from the case and whose involvement in the case is not relevant to the instant appeal.

1

U.S. Pat. No. 7,938,300 (the "'300 Patent"), concerned clothing hangers having (1) a hook that permitted hangers to "cascade" from one another, and (2) a configuration that allowed the hangers to "nest" so that cascade hook of one hanger would "abut" the cascade hook of another.  A067.

Worldwide was represented during both the prosecution of the application for the '300 Patent and during the infringement suit by Appellant, Attorney Sonnabend.  On Defendants' motion for summary judgment, the trial court held that Attorney Sonnabend engaged in inequitable conduct during the prosecution of the application for the '300 Patent by failing to disclose information relating to a non-prior art, third party hanger.  A065.  The trial court reconsidered its ruling on Worldwide's motion under Fed. R. Civ. P. 59(e), reaching the same outcome. A066, A085.  Based on this finding, the trial court sanctioned Attorney Sonnabend in the amount of $818,124.65 in attorneys' fees and nontaxable litigation expenses. A064.  This appeal timely followed.[2]

---

[2]  The parties thereafter mediated the issue of sanctions, agreeing on the amount of sanctions payable contingent on the outcome of this appeal.

## IV   STATEMENT OF THE FACTS

### A   THE PROSECUTION OF THE APPLICATION FOR THE '300 PATENT

On or about July 30, 2008, Attorney Sonnabend filed a patent application entitled "Nestable Hanger with Integrated Cascade Hook" (the "Application") for Worldwide.

The subject matter of the Application was clothing hangers, and more specifically, clothing hangers having (1) a hook that permitted hangers to "cascade" from one another, and (2) a configuration that allowed the hangers to "nest" so that cascade hook of one hanger would "abut" the cascade hook of another. A067.

While prosecution of the Application was ongoing, Worldwide was in active discussion with retailer Bed Bath and Beyond, Inc. ("Bed Bath and Beyond") concerning possible wholesale purchase by Bed Bath and Beyond of commercial embodiments of the subject matter of the Application. A113-A116. Bed Bath and Beyond did not ultimately enter into a purchase agreement with Worldwide; instead, Bed Bath and Beyond purchased such products from a different source. A115-A120. On or about February 4, 2010, Attorney Sonnabend notified Bed Bath and Beyond, on behalf of Worldwide, that Worldwide had a pending application that, as amended at that time, covered the hangers Bed Bath and Beyond was purchasing from this different source. A123-A125.

3

On or about March 2, 2010, counsel for Bed Bath and Beyond and its vendor, Cohesion Products, Inc. (collectively, "Defendants"), responded to the February 4, 2010 letter.  In its letter of March 2, 2010, counsel for Defendants disclosed, among other purported prior art references not relevant to this appeal, a low-resolution image of a purported prior art hanger labeled "Home Products International" (the "Merrick Hanger Image")[3].  A126-A129.

Worldwide subsequently ordered, received, and forwarded to Attorney Sonnabend, the Merrick hanger it had ordered.  A076-A077.  It was later determined that the Merrick hangers obtained by Worldwide and forwarded to Attorney Sonnabend differed from the hangers depicted in the Merrick Hanger Image reference.  A065-A066, A076-A077.  In other words, the product in Attorney Sonnabend's possession and the product depicted in the image were different products.  *Id.*  The former were model "C90610" while the latter were model "C90601".  *Id.*

At roughly this time, Worldwide contacted the Merrick company in an effort to determine when the physical Merrick hangers were first publicly available, i.e., Worldwide sought to determine for itself whether or not the physical Merrick hangers in its possession constituted prior art.  A135-A136.  Calls to Merrick's

---

[3]  It was shortly thereafter determined that the "Home Products International" hanger was manufactured by a company called "Merrick", and so throughout this case the "Home Products International" hangers have been referred to as "Merrick" hangers.

4

customer service number – the only contact number located by Worldwide – yielded no useful information. *Id.* As a result, Worldwide was unable to determine if the physical Merrick hanger product was prior art. *Id.*

On or about April 27, 2010, in the prosecution of the Application, Attorney Sonnabend submitted an IDS containing the Merrick Hanger Image. A068. In that submission, Attorney Sonnabend stated:

> Applicant submits it is uncertain whether the reference listed on the attached PTO/SB/08 qualifies as a prior art reference as the Applicant has no date information relating to this reference. Applicant draws the Examiner's attention to items C90601-A/A12.

A139.

On or about May 26, 2010, the examiner issued an office action in which he stated that the Merrick Hanger Image reference had "not been considered on the merits" because it "has not been provided with a date" (i.e., because Worldwide was unable to determine its date). A147. On or about June 10, 2010, Attorney Sonnabend submitted a response to the May 26, 2010 office action. A155-A163. In that response, Attorney Sonnabend did not address the Merrick Hanger Image reference because no previous rejection had been based on it. *Id.*

On or about October 5, 2010, the examiner issued a final rejection. A164-A172. This final rejection included at least one rejection based in part on the Merrick Hanger Image. *Id.* Without comment, the examiner had determined sometime between the May 26, 2010 office action and the October 5, 2010 final

5

rejection, that the Merrick Hanger Image reference was available at least as early as August 10, 2006, rendering it prior art. *Id*.

In response to this final office action, Attorney Sonnabend contacted the examiner in a phone interview on or about on or about October 12, 2010, and thereafter submitted an amendment after final on or about the same day. A174-A177, A178-A186. Attorney Sonnabend testified that he did not specifically recall the details of the phone interview. A069-A70. The Interview Summaries contained in the file history (both Attorney Sonnabend's summary and the examiner's summary) indicated that Attorney Sonnabend and the examiner discussed during the phone interview the Arnold reference and the "Merrick (website)" (i.e., the Merrick Hanger Image). A174-A177. The summaries also referenced discussion of a proposed amendment which appeared to obviate the rejections. *Id*. Attorney Sonnabend testified that he believed that the summaries to be accurate. A190.

Subsequent to the interview and amendment after final, the examiner allowed the Application. A197-A200.

## B    THE NON-PRIOR ART MERRICK HANGER PRODUCT

Some time after the interview and allowance, on or about April 27, 2011, Attorney Sonnabend received a letter from counsel for Defendants advising Attorney Sonnabend that Defendants had obtained samples of certain Merrick

6

nesting hangers (the "Merrick Hanger Product"). A072. The April 27, 2011 letter falsely characterized these hangers as being the same as those depicted in the Merrick Hanger Image reference, model C90601 (the Merrick Hanger Product in Defendants' possession and discussed in the letter were in fact model C90610). A072-A073.

In the April 27, 2011 letter, counsel for Defendants further advised Attorney Sonnabend that the Merrick hangers in Defendants' possession "abutted" one another when nested. *Id.* The letter included high resolution images purporting to demonstrate this. *Id.* As a result, counsel for Defendants informed Attorney Sonnabend that they believed Attorney Sonnabend was under an obligation to withdraw the Application from allowance and advise the examiner of the information provided in the letter. *Id.*

Attorney Sonnabend analyzed the information provided in the April 27, 2011 and concluded that the Merrick Hanger Product discussed in the April 27, 2011 letter (model C90610), as opposed to the Merrick Hanger Image considered by the examiner (model C90601), had not been shown to be prior art, and so he was under no obligation to disclose to the examiner the information contained in April 27, 2011 letter concerning the Merrick Hanger Product. A133. A192-A194.[4] Based

---

[4] A representative of Worldwide, Robert Doherty, also testified that in Worldwide's view, Defendants' conclusions concerning abutment with the Merrick Hanger Product were wrong, i.e., the Merrick Hanger Product did not abut when nested, and so it could not affect patentability even if they were

on this legal analysis, Attorney Sonnabend did not disclose any information about the Merrick Hanger Product to the examiner.  *Id.*

The patent-in-suit thereafter issued from the Application, and the present suit was filed.

**C    SUMMARY JUDGMENT AND CONFIRMATION OF THE NON-PRIOR ART STATUS OF THE MERRICK HANGER PRODUCT**

On November 15, 2012, Defendants moved for summary judgment of invalidity/unenforceability due to inequitable conduct.  Defendants argued that by not submitting to the patent examiner the allegations and information in the April 27, 2011 letter and/or the information concerning the Merrick Hanger Product discussed in the letter (i.e., model C90610),  Attorney Sonnabend had engaged in inequitable conduct.

In support of its motion, Defendants submitted a report of a "patent expert", William Poms.  A073.  The Poms Report opined ostensibly on both materiality and intent.  *Id.*  On the former, Mr. Poms applied the abrogated "Rule 56" and/or "Reasonable Examiner" test, while on the latter, Mr. Poms speculated as to Attorney Sonnabend's state of mind.  A097-A098, A105-A106.  Mr. Poms further opined that Attorney Sonnabend, "willfully withheld pictures and physical samples of *prior art* hangers," (A092, A101, emphasis added), which Mr. Poms deemed to

───────────────

shown to be prior art.  A133-A134.

8

be material.  *Id.*   In addition, Mr. Poms testified, among other topics: on what

Attorney Sonnabend "must have said" to the examiner in the aforementioned

interview and that Attorney Sonnabend was "totally lacking in credibility".  A103.

Worldwide opposed the motion for summary judgment and moved to

preclude the Poms Report.  A075.  On on September 30, 2013, the trial court ruled

against Worldwide on the associated motion to preclude the testimony of Poms and

in Defendants' favor on the inequitable conduct summary judgment motion.  A065.

After receiving the September 30, 2013 ruling, Worldwide terminated

Attorney Sonnabend's representation and hired replacement counsel, the firm of

Carlton Fields.  In reviewing the record and discovery materials, Carlton Fields

confirmed that the hangers depicted in the April 27, 2011 letter (the same as those

previously in Attorney Sonnabend's possession, i.e., model C90610) were *a*

*different hanger model altogether* from those depicted in the Merrick Hanger

Image considered by the examiner (i.e., model C90601).  A065-A066.

Based on this determination, overlooked by the court, the parties and the

expert, William Poms, Worldwide filed a Rule 59(e) motion, asking that the trial

court reconsider and reverse its prior ruling on the inequitable conduct motion.

A065-A066.  The trial court agreed to reconsider, and roughly 15 months later, it

issued its opinion.  A065-A086.  In that opinion, the trial court acknowledged that

> Mr. Poms was clearly as mistaken as the parties and the Court in
> characterizing the physical hangers provided to Mr. Sonnabend by

9

Defendants' counsel as the same models as those depicted in the
brochure Merrick Reference, *and it is not clear that the physical
hangers possessed by Mr. Sonnabend themselves constituted a prior
reference*

A076-A077 (emphasis added). Despite this finding, the Court ruled again in favor

of Defendants. A065-A086.

Thereafter, on express invitation by the trial court, Defendants moved for

attorneys' fees under 35 U.S.C. § 285 and for sanctions against Attorney

Sonnabend under 28 U.S.C. § 1927. On April 9, 2015, the trial court granted the

motion, awarding attorneys' fees and sanctions, jointly and severally against

Worldwide Home Products and Attorney Sonnabend, in the amount of

$818,124.65. A053-A064.

## V    SUMMARY OF THE ARGUMENT

The trial court's award of sanctions should be reversed because the summary

judgment finding of inequitable conduct on which it rests is in error and must also

be reversed. The trial court also erred in its denial of Worldwide's *Daubert* motion

regarding the report of William Poms, upon which a significant portion of the

finding of inequitable conduct rests.

In *Therasense, Inc. v. Becton, Dickinson & Co.,* this Court stated the

standard for inequitable conduct, stating:

[t]o prevail on the defense of inequitable conduct, the accused
infringer must prove that the applicant [1] misrepresented or omitted
material information [2] with the specific intent to deceive the PTO

10

649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc).  This Court further stated that both

must be shown by clear and convincing evidence.  *Id.*  The trial court made its

determination of inequitable conduct (a) without properly analyzing either

materiality or intent, and (b) based largely on supposition, weak inference, and

upon the faulty opinion of Defendants' "patent expert", William Poms.

Had the trial court properly analyzed materiality and intent, it would have

found both lacking.

First, the non-disclosed information concerned admittedly non-prior art, and

so its disclosure would not have altered the outcome of the patent prosecution; that

is, because the non-disclosed information did not concern prior art, it could not

have affected patentability.  Thus, it was not material for inequitable conduct

purposes.  *American Calcar, Inc. v. American Honda Motor Co.*, 768 F.3d 1185,

1189 (Fed. Cir. 2014) (citing *Therasense*) (In order to determine whether a

withheld reference is "but for" material, one must determine whether the

application would not have issued "but for" the withheld information.).

Second, the trial court failed to consider Attorney Sonnabend's (and

Worldwide's) explanation for its decision not to disclose the information about the

non-prior art.  Had the trial court properly considered the explanation, it would

have determined that Attorney Sonnabend's explanation (and Worldwide's)

presented a separate, reasonable inference concerning intent, thus rendering the

conclusion of intent to deceive improper. *Therasense*, 49 F.3d at 1290-91 ("to meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.' . . . Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found.")

## VI   STANDARD OF REVIEW

This Court reviews a district court's award of legal fees under 35 U.S.C. § 285 by first reviewing de novo whether the court applied the proper legal standard. *Glaxo Grp. Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1346 (Fed. Cir. 2004). The Court then reviews the trial court's factual findings, including whether the case is exceptional, for clear error. *Id.*

This Court reviews sanctions under 28 U.S.C. § 1927 pursuant to the law of the regional circuit. *Nystrom v. TREX Co.*, 424 F.3d 1136, 1141 (Fed. Cir. 2005). The Second Circuit reviews the imposition of section 1927 sanctions under an abuse of discretion standard. *People of State of N.Y. by Vacco v. Operation Rescue Nat.*, 80 F.3d 64, 72 (2d Cir. 1996).

Where inequitable conduct has been found on summary judgment, this Court reviews the determination of inequitable conduct *de novo*. *Network Signatures, Inc. v. State Farm Mut. Auto. Ins. Co.*, 731 F.3d 1239, 1242 (Fed. Cir. 2013);

*Leviton Mfg. Co. v. Universal Sec. Instruments, Inc.*, 606 F.3d 1353, 1358 (Fed. Cir. 2010).

This Court reviews a trial court's decision on a *Daubert* motion to preclude expert testimony under the law of the regional circuit.  *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390 (Fed. Cir. 2003).  The Second Circuit reviews a district court's ruling on the admission of expert testimony for abuse of discretion. *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 160 (2d Cir. 2012).

## VII  ARGUMENT

### A    THE IMPOSITION OF SANCTIONS WAS PREMISED ENTIRELY ON THE TRIAL COURT'S FINDING OF INEQUITABLE CONDUCT, AND SO THE SANCTIONS MUST BE REVERSED BECAUSE THE INEQUITABLE CONDUCT FINDING IS WRONG

This Court reviews a district court's award of legal fees under 35 U.S.C. § 285 by first reviewing de novo whether the court applied the proper legal standard. *Glaxo Grp. Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1346 (Fed. Cir. 2004).  The Court then reviews the trial court's factual findings, including whether the case is exceptional, for clear error.  *Id.*   A factual finding is clearly erroneous if, despite some supporting evidence, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.  *1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d 1367, 1372 (Fed. Cir. 2012),;  *United States v. Cramer*, 777 F.3d 597, 601 (2d Cir. 2015) ("A finding of fact is clearly erroneous

only if, after reviewing all of the evidence, this Court is left "'with the definite and firm conviction that a mistake has been committed.'").

This Court reviews sanctions under 28 U.S.C. § 1927 pursuant to the law of the regional circuit. *Nystrom v. TREX Co.*, 424 F.3d 1136, 1141 (Fed. Cir. 2005). The Second Circuit reviews the imposition of section 1927 sanctions under an abuse of discretion standard. *People of State of N.Y. by Vacco v. Operation Rescue Nat.*, 80 F.3d 64, 72 (2d Cir. 1996). A district court abuses its discretion when its decision is based on clearly erroneous findings of fact, is based on erroneous interpretations of the law, or is clearly unreasonable, arbitrary or fanciful. *Id.; Vincenty v. Bloomberg,* 476 F.3d 74, 83 (2d Cir. 2007) (Under Second Circuit law, an abuse of discretion occurs, *inter alia,* when a trial court's decision rests on an error of law, such as application of the wrong legal principle, or a clearly erroneous factual finding.).

In the present case, the trial court based both its award of fees under 35 U.S.C. § 285 and its sanctions under 28 U.S.C. § 1927 on a single underlying finding, namely, that "Mr. Sonnabend engaged in a pattern of inequitable conduct" A056 ("Mr. Sonnabend engaged in a pattern of inequitable conduct by willfully misrepresenting and selectively withholding information from the PTO examiner that he understood to be material. Mr. Sonnabend then prosecuted the instant case on behalf of Plaintiff, alleging infringement of the wrongfully procured patent.

Consequently, this is an exceptional case for purposes of a fee award under 35
U.S.C. section 285.") and A061-A062 ("the infringement claims that Mr.
Sonnabend prosecuted on Plaintiff's behalf were baseless from the start, in that
they were premised on alleged violations of rights in a patent that Mr. Sonnabend
had knowingly obtained through intentional inequitable conduct.").  Thus, if the
trial court's finding of inequitable conduct is wrong, then the award of fees and
imposition of sanctions is also wrong and must be reversed.  *See Leviton Mfg. Co.*,
606 F.3d at 1358 (ruling on inequitable conduct decision that underpinned award of
sanctions).

Such is the case here.  The trial court erroneously ruled, on summary
judgment, that Attorney Sonnabend had committed inequitable conduct.  This
decision was based in significant part on the testimony (in the form of an expert
report) of William Poms, a misapplication of law, and a skewed, selective reading
of the record.  Together, these clear errors, one compounding the next, led to the
trial court's imposition of fees and sanctions.

As the following discussion demonstrates, the trial court's summary
judgment finding of inequitable conduct is in serious error, and the award of
sanctions based on this ruling must be reversed.

### B     THE TRIAL COURT'S INEQUITABLE CONDUCT FINDING IS CLEARLY ERRONEOUS AND MUST BE REVERSED

This Court in *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (*en banc*), established the current, applicable standard for a showing of inequitable conduct.  The Court stated that:

> [t]o prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant [1] misrepresented or omitted material information [2] with the specific intent to deceive the PTO

*Therasense,* 649 F.3d at 1287; *and see Ohio Willow Wood Co. v. Alps S., LLC,* 735 F.3d 1333, 1344 (Fed. Cir. 2013).  These two elements, "intent" and "materiality", are independent requirements, each of which defendant must prove, independently from one another, by clear and convincing evidence:

> [t]o establish unenforceability based on inequitable conduct in the PTO, it must be shown that information material to patentability was withheld from the PTO, or material misinformation was provided to the PTO, with the intent to deceive or mislead the patent examiner into granting the patent.  Withholding of material information and intent to deceive or mislead must be established by clear and convincing evidence.

*Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1290 (Fed. Cir. 2012) (internal citations to *Therasense* omitted).

Because of this high standard of proof, as well as the serious consequences that follow a finding of inequitable conduct, "summary judgment that a reputable attorney has been guilty of inequitable conduct, over his denials, ought to be, and

can properly be, rare indeed." *Network Signatures, Inc.*, 731 F.3d 1239, 1242 (Fed. Cir. 2013).

In the present case, the trial court failed to properly analyze the facts and apply the stringent standards of inequitable conduct. Instead, due to Attorney Sonnabend's "aggressive[]" litigation, A062, it leaped to the conclusion, *on summary judgment,* that Attorney Sonnabend was guilty of inequitable conduct. Properly analyzed, the facts do not support, by clear and convincing evidence or otherwise, the trial court's conclusion. Lacking is clear and convincing evidence of the requisite materiality and intent to support an inequitable conduct finding.

## 1    THE TRIAL COURT'S RULING ON MATERIALITY WAS WRONG

### a    THE TRIAL COURT FAILED TO ANALYZE "BUT FOR" MATERIALITY, AND THUS ERRED IN FINDING MATERIALITY

The first, independent prong of an inequitable conduct finding is "materiality." *Therasense*, 649 F.3d at 1287. The test for materiality is "but for" materiality:

> [t]his court holds that, as a general matter, the materiality required to establish inequitable conduct is but-for materiality. When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art. Hence, in assessing the materiality of a withheld reference, the court must determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference.

*Therasense*, 649 F.3d at 1291.  In order to determine whether a withheld reference is "but for" material, one must determine whether the application would not have issued "but for" the withheld information.  *American Calcar, Inc. v. American Honda Motor Co.*, 768 F.3d 1185, 1189 (Fed. Cir. 2014) (citing *Therasense*).  In other words, would the application have failed to meet the "conditions for patentability" of 35 U.S.C. §§ 102 and 103 had the information been presented to the examiner.   Unless and until "but for" materiality is shown by clear and convincing evidence, inequitable conduct cannot be found.  *Therasense*, 649 F.3d at 1291.

In the present case, the trial court  failed to analyze the materiality element at all, no less find any "but for" materiality.  The Court's substantive finding on materiality[5], in its entirety, is as follows:

> The materiality of the Merrick Reference cannot genuinely be disputed. Although Mr. Sonnabend claims that he originally revealed the brochure Merrick Reference out of an abundance of caution, unsure of whether it predated the Application, the PTO's confirmation of its pre-Application date, and the citation of the Merrick Reference in the PTO's original rejection of the Application, left no room for doubt as to the materiality of that brochure reference. Equally clear is the materiality of the PTO's interpretation of the brochure Merrick Reference as a depiction of a hanger constituting prior art in relation

---

[5] The trial court, in its discussion of materiality, addressed only *"the* Merrick hanger." (emphasis added).  This, too, is error, as there was not one, but two different Merrick hanger references, one which was shown to be prior art (the C90601 hanger) and one which has never been shown to be prior art (the C90610 hanger).  Conflating the two references as one further renders the trial court's conclusions erroneous.  See section [], below.

1 8

to the Application. Information forming the basis of the PTO's understanding of the physical relationships of the Merrick hangers in their nested configuration is shown in the record, by clear and convincing evidence, to be but-for material to the PTO's decision to grant the '300 Patent. Mr. Poms' expert affidavit provides further confirmation of the centrality of the examiner's understanding of the attachment feature of the hanger product to the decision to issue the patent.

A080.[6]  The trial court's cursory discussion of materiality falls well short of a finding of "but for materiality", that is, that the examiner would not have allowed a claim had it been aware of the information in question. *Therasense,* 649 F.3d at 1291.

Rather than provide any substantive discussion of "but for" materiality, the trial court instead cited to the Poms Report for support of the finding of materiality. The Poms Report provides no such support, however, as it applies the wrong test for materiality, and Mr. Poms was not qualified to substantively discuss materiality under the correct test in any event.

First, Mr. Poms applied the wrong test for materiality.  More specifically, Mr. Poms applied only the "reasonable examiner" test for materiality, i.e., the test under 37 C.F.R. § 1.56.  A097.  This Court expressly has expressly rejected the

---

[6]  Not only can the materiality of the withheld information be disputed, but Worldwide *did* dispute the materiality.  First, as discussed in detail below, the withheld information did not concern prior art, and so could not be "but for" material.  Second, Worldwide testified under oath that it believed the non-prior art hangers, model C90610, operated so as not to "abut" when nested, and so disclosure of them to the Patent Office would not have prevented issuance of any claims of the patent-in-suit.  A133-A134.

Rule 56 and/or "reasonable examiner" tests of "materiality", however. *Therasense*,

49 F.3d at 1293-94.

The death of the Rule 56 and/or "reasonable examiner" test of material was

confirmed in *American Calcar, Inc. v. Am. Honda Motor Co.,* 651 F.3d 1318, 1335

(Fed. Cir. 2011) (*American Calcar I*).   In *American Calcar I,* this Court stated:

> the withheld information may be material *if it would have blocked*
> *patent issuance* under the PTO's preponderance of the evidence
> standard, giving those patents' claims their broadest reasonable
> construction. *Id*. We cannot infer that finding from the district court's
> opinion. Although we decide that the district court properly concluded
> that the withheld information was not cumulative of any of the prior
> art of record, *the court evaluated materiality of the 96RL information*
> *based on the PTO's Rule 56 standard and the "reasonable examiner"*
> *standard, both standards that we rejected in Therasense*, 649 F.3d at
> 1289. We thus vacate the district court's findings of materiality as to
> the Search patents and remand to the district to decide the issue under
> the but-for materiality standard set forth in *Therasense.*

651 F.3d at 1335 (emphasis added).   Thus, Mr. Poms' reliance on the "reasonable

examiner" test of materiality and/or any test incorporating Rule 56 is wrong as

expressly rejected by this Court in *Therasense* and subsequently confirmed in

*American Calcar I.*

Despite the fact that Mr. Poms' report is critically flawed for its application

of the "reasonable examiner" and/or Rule 56 tests for materiality, the trial

expressly adopted the report's conclusions concerning materiality and embraced its

materiality analysis.  Specifically, the trial court stated that the "duty of candor is

codified in 37 C.F.R. § 1.56(a) [i.e., "Rule 56"]," and the "violation of [this] duty

of candor constitutes inequitable conduct." A079.   This is wrong, as this Court

made clear in *Therasense*, *American Calcar I*, and the numerous other cases since

*Therasense* that addressed the issue of materiality.   Materiality in the context of

inequitable conduct is "but for" materiality, period.

Second, not only did Mr. Poms apply (and the trial court adopt) the wrong

test for materiality, but Mr. Poms could not have opined on "but for" materiality

had he wanted to because he is not qualified to do so.

In order to determine whether a withheld reference is "but for" material, one

must determine whether the application would not have issued "but for" the

withheld information.  *American Calcar, Inc. v. American Honda Motor Co.*, 768

F.3d 1185, 1189 (Fed. Cir. 2014) (citing *Therasense*).   In other words, would the

application have failed to meet the "conditions for patentability" of 35 U.S.C. §§

102 and 103 had the information been presented to the examiner.   This "but for"

materiality determination necessarily asks what one of ordinary skill in the art

would have understood at the time of invention, i.e., whether or not one of ordinary

skill in the art would have considered the claimed invention anticipated or obvious

in light of the withheld information, and so to opine on whether the information is

material, the party opining on it must at least be *one of ordinary skill in the*

*relevant art*.  *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1364

(Fed. Cir. 2008) ("DeMonte has failed to demonstrate any possible relevancy or

reliability of [patent law expert] Mr. Bliss's testimony as to technical matters in light of his lack of relevant technical expertise.").

Mr. Poms was not qualified as an expert on hanger design or other mechanical arts. He is not one of skill in the art, and so he is not qualified to testify on "but for" materiality. His testimony, contained in his report, thus cannot underpin the trial court's determination of materiality, and the trial court's rulings would be in error to the extent they rely on the Poms Report even if Mr. Poms had applied the "but for" materiality test (which he did not).

### b    THE WITHHELD INFORMATION DID NOT CONCERN PRIOR ART, SO IT COULD NOT BE "BUT FOR MATERIAL"

While the trial court's failure to analyze "but for" materiality warrants reversal by itself, reversal is further warranted in light of the fact that the withheld information was not prior art and did not concern prior art. Having no relation to prior art, the withheld information could not be material as a matter of law.

A fundamental prerequisite to materiality is that a reference be *prior* art, not merely art; that is, it must be properly dated so as to qualify temporally as prior art. *See, e.g.*, *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 260 Fed.App'x. 284, 291 (Fed. Cir. 2008) (finding that undisclosed co-pending applications would not have provided information material to patentability because "[d]ue to their filing date, the references could not have served as prior art"); *Schreiber Foods, Inc. v.*

*Beatrice Cheese, Inc.*, 31 F. App'x 727, 732 (Fed. Cir. 2002) ("To meet the materiality requirement, a reference must necessarily be prior art."); *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 940 (Fed Cir. 1990) (finding that since device was not prior art, it was not material to patentability). References that are not prior-art cannot form the basis for any rejection. Such references are therefore not "but for" material and cannot form the basis for an inequitable conduct defense.

In the present case, it was exactly this type of non-prior art on which the trial court based its inequitable conduct finding. The trial stated:

> Mr. Poms was clearly as mistaken as the parties and the Court in characterizing the physical hangers provided to Mr. Sonnabend by Defendants' counsel as the same models as those depicted in the brochure Merrick Reference, and *it is not clear that the physical hangers possessed by Mr. Sonnabend themselves constituted a prior reference*

A076-A077 (emphasis added).[7] These "hangers provided to Mr. Sonnabend" are model "C90610" hangers, the same hangers depicted in the "high-resolution photographs," but *different hangers from the prior art hangers,* which are model "C90601" hangers. A066 (the trial court correctly characterized the two hanger models as "C90601" – the model number depicted in the prior art brochure – and "C90610" – the model number that was the subject of communications and high-resolution photographs sent to Plaintiff by Defendants' counsel); A070-A071.

---

[7]  To this day, the C90610 hanger has never been shown to be prior art.

23

Having recognized the different hanger models, the trial court then glossed over this distinction. Rather than correctly treating the two distinct hangers as two different references, it treated the two as being the same:

> Mr. Sonnabend did not disclose either the physical Merrick hangers or the high-resolution photographs of the C90610 Merrick hangers (both far clearer demonstrations of how *the hanger* worked than the thumbnail images in the Merrick Reference [i.e., the C90601 product]) after Defendants' counsel provided them to him.

A083 (emphasis added). Likewise, the trial court stated that

> Plaintiff's argument that it could properly withhold the physical embodiments *of referenced prior art* is baseless.

A084 (emphasis added).

The trial court's error is manifest here: there is not one hanger (i.e., *"the hanger"*), and the C90610 are not "physical embodiments of referenced prior art." The "referenced prior art" was the C90601 hanger; the withheld information concerned the C90610 hanger, a different "reference". Nonetheless, the trial court treated the C90601 and C90610 hangers as one in the same (i.e., as being "*the hanger*" and the "referenced prior art") as opposed to two different hangers (i.e., the C90601 hanger and the C90610 hanger). This is error.

The C90601 and C90610 hangers are two distinct hangers – molded from two different injection molds – and are legally two different references. The "high-resolution photographs" of the C90610 hanger and the "physical hangers [the C90610 hanger] provided to Mr. Sonnabend by Defendants' counsel" could

24

demonstrate only how that reference – the non-prior art C90610 hanger – worked. The withheld information, about the C90610 hanger, could not demonstrate how the prior-art, the distinctly different model C90601 hanger, worked.[8]  The former was not legally relevant to the latter.

The lack of "but for" materiality of the non-prior art C90610 hanger is confirmed by the actions of the examiner himself, who had correctly distinguished between mere art and relevant *prior art.*  As of the April 29, 2011 letter from Defendants' counsel to Attorney Sonnabend – which concerned undated, non-prior art model C90610 – the examiner in the case had already previously refused to consider information regarding the C90601 hanger until he confirmed it date-wise to be prior art.  A143-A154.  Had information about the C90610 hanger been submitted, the examiner would likewise have refused to consider it until it, too, could be confirmed date-wise to be prior art.  The model C90610 hanger, however, has never been shown to constitute prior art, and therefore would never have been considered by the examiner.  It therefore could not have affected patentability. "But for" materiality did not exist.

---

[8]  The C90601 and C90610 model hangers are undoubtedly similar, hence the failure of the trial court, the expert and the parties to initially distinguish them. Nonetheless, once the two have been shown to differ – as the trial court acknowledges – they cannot be considered the same reference for the simple fact that they are not the same product.

In the final analysis, the trial court correctly held that the C90610 hangers were not the same models as those depicted in the brochure Merrick Reference, i.e., the C90601 hangers, but then erred gravely by ignoring this reality and treating the two as the same. The error was grave because – as the trial court acknowledged – the C90610 was never shown to be prior art. Information about it therefore could not affect patentability, and so such information is non-material under *Therasense*. The trial court erred by effectively ruling otherwise.[9]

**c**    **THERE WERE NO "STATEMENTS" AT ALL, SO THERE COULD NOT HAVE BEEN "MATERIAL MISREPRESENTATIONS" IN ANY SUCH STATEMENTS**

Finally, the trial court found that Attorney Sonnabend had made material misrepresentations to the patent examiner during the October 12, 2010 interview. Specifically, the trial court held:

> Logic dictates the conclusion that Mr. Sonnabend misrepresented the cascade hook feature of the Merrick hangers to the PTO examiner in the telephone conversation, rendering the examiner receptive to the Amended Application, which draws a false distinction between Plaintiff's hangers and the Merrick Reference.

---

[9] The Pom Report does not alter this conclusion. First, the trial court acknowledged that Pom, like everyone else, was mistaken regarding the two hanger models. A076-A077. Any conclusions on materiality he may have reached were therefore wrong not only because they were based on the inapplicable "reasonable examiner" and "Rule 56" standards (see previous section), but were wrong twice-over as being based on non-material, non-prior art.

2 6

A082.  Nowhere does the trial court indicate what was actually said during that

interview, and the record is devoid of any such detail.  Instead, the trial court

apparently rests its conclusion on the Poms Report, which the trial court cited as

follows:

> Mr. Poms concluded with respect to the interview, based on his
> extensive experience as a PTO examiner and patent prosecutor, that
> "the only way the examiner could have reached the conclusion that
> the hooks shown in the image were not in contact with each other was
> if the plaintiff's attorney told him, during their oral conversation, that
> the hooks were not touching."

A074.

Mr. Poms was not privy to the interview, however, and Attorney Sonnabend

testified that he had no recollection of the specifics of the interview (but that he

believed that the non-prior art C90610 hangers were not discussed).  A083 ("Mr.

Sonnabend testified only that he had no memory of any of the details discussed

during the interview").  Mr. Poms' guesses as to what "must have been said"

during the interview were mere speculation – as far from clear and convincing

evidence as one might imagine – and they lack completely any detail of any

specific, material misrepresentation.  They thus cannot form the basis for any

finding of materiality, no less a finding by clear and convincing evidence.  The trial

court therefore erred in relying on the Poms Report on this point and in finding that

Attorney Sonnabend had made material misrepresentations to the Patent Office

during the October 12, 2010 interview.

## 2    THE TRIAL COURT ERRED IN FINDING INTENT

Separate and apart from a showing of "but for" materiality, a finding of inequitable conduct requires a showing, by clear and convincing evidence, of: (1) a specific intent to deceive the Patent Office; and (2) a lack of any other reasonable contrary inference.  *Therasense*, 649 F.3d at 1287.  The record is wholly lacking such a showing.

### a    THE TRIAL COURT INCORRECTLY DISCOUNTED ATTORNEY SONNABEND'S REASONABLE EXPLANATION FOR WITHHOLDING INFORMATION ABOUT THE NON-PRIOR ART C90610 HANGERS

Under *Therasense,* the intent to deceive element of the inequitable conduct case is found if and only if such intent is the *only* reasonable inference to be drawn from the evidence so as to *require* a finding of intent to deceive.  This Court stated in *Therasense*:

> to meet the clear and convincing evidence standard, the specific intent to deceive must be "the single most reasonable inference able to be drawn from the evidence." *Star,* 537 F.3d at 1366. Indeed, the evidence "must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances." *Kingsdown,* 863 F.2d at 873 (emphasis added). Hence, *when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be  found*.

49 F.3d at 1290-91 (second emphasis added, first emphasis in original).  Where other explanations exist for the accused actions, intent to deceive *cannot* be found;

that is, a finding of intent to deceive, and thus inequitable conduct itself, is

precluded.  *Id.*

At all times before and during the litigation, Attorney Sonnabend

consistently explained the reasons for his actions.  Specifically, Attorney

Sonnabend explained that he understood that:

> [c]ontrary to Defendants' position, the law distinguishes both
> generally between different references and expressly between written
> references (such as the webpage/printout of the Merrick Hanger
> Website Image [the C90601 hanger]) and products themselves (such
> as the Merrick Hanger Product [the C90610 hanger]).

A203.    With this understanding, Attorney Sonnabend explained that he withheld

information about the C90610 Merrick Hanger Product because

> [t]he former reference (the image [of the C90601 hanger]) was of
> record before the examiner; the latter reference (the [C90610] hanger
> itself) was not and was not determined to be prior art . . . .

*Id.*

Attorney Sonnabend also explained in detail the basis for his understanding,

namely, that he understood that the patent law treats printed references, such as the

website image of the C90601 hanger, as distinct references from physical

embodiments (i.e., actual products), such as the C90610 hanger.  See A203-A206.

Attorney Sonnabend explained at length this analysis of case law and the differing

definitions of printed reference and physical embodiments under 35 U.S.C. §

102(a) and (b).  *Id.*  He explained:

Once it is understood that the Merrick Hanger Website Image [the C90601 hanger] and Merrick Hanger Product [the C90610 hanger] are two distinct references, and that the availability of the former as a prior art reference does not mean the latter is also available [as a prior art reference], one immediately recognizes the flaw in Defendants' arguments.  Because the Merrick Hanger Product [the C90610 hanger], for whatever it taught, was a different reference from the Merrick Hanger Website Image [the C90601 hanger], for whatever it taught, one sees that the teaching of the former has no impact on the teaching of the latter.  Each teaches what it teaches separate and apart from the other, and each qualifies as its own reference under section 102.  Thus, when Defendants provided Plaintiff with Defendants' analysis of the Merrick Hanger Product [the C90610 hanger], discussed below, the the fact that the examiner had already considered the Merrick Hanger Website Image reference [the C90601 hanger] did not mean that Plaintiff was then required to submit Defendants' analysis of the new reference of the product itself [the C90610 hanger], unless the product itself was shown to be prior art.

A206.[10]

The trial court disregarded this explanation out of hand, stating:

Mr. Sonnabend now claims that he did not do so because he did not know that they themselves were prior art. Mr. Sonnabend selectively withheld from the PTO examiner the most relevant information concerning the physical attributes of the hanger product depicted in the reference that Mr. Sonnabend provided to the PTO examiner, which is indicative of a clear intent to deceive. . . . His sophistry concerning the logic underlying his behavior is insufficient, in light of the compelling circumstantial evidence that he provided false information to the examiner, to frame a genuine issue of material fact regarding his intent to deceive the examiner.

A083-A084.  The trial court was wrong to disregard this alternative explanation for

Attorney Sonnabend's actions, particularly on summary judgment.  The trial

---

[10]  This explanation is "reasonable", not the least because it is legally correct.  See section VI.B.2.c below.

court's ruling transgressed the rule of law stated in *Kingsdown* and reaffirmed in *Therasense* that

> the evidence [of intent to deceive] "must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances." *Kingsdown,* 863 F.2d at 873 (emphasis added). Hence, *when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found.*

49 F.3d at 1290-91 (second emphasis added, first emphasis in original). The trial court therefore erred in disregarding Attorney Sonnabend's explanation and in finding intent to deceive.

### b    THE TRIAL COURT REACHED ITS CONCLUSION OF INTENT TO DECEIVE BY SELECTIVELY IGNORING THE RECORD

The trial court apparently disregarded Attorney Sonnabend's explanation for his actions because it believed the explanation was an *ex post facto* rationalization of his actions, which the trial court mistakenly characterized as having been made for the first time during summary judgment motion practice. The trial court's conclusion is belied by the record and is clearly erroneous.

The trial court made clear that it believed Attorney Sonnabend's explanation to be an 11th hour, after the fact rationalization. It stated:

> [i]t was only later, in a December 21, 2012, affidavit proffered in support of Plaintiff's summary judgment motion, that Mr. Sonnabend asserted that he believes that the physical Merrick hangers that he possessed constituted a reference entirely separate from the Merrick Reference consisting of the website version of the hanger brochure, that he had been unable to determine whether the Merrick hangers,

whose packaging the parties now acknowledge bears a slightly
different product number from the product numbers listed on the
Merrick Reference website (C90610 rather than C90601), were indeed
prior art by reason of having been offered for sale prior to the
Application, and that he had determined for that reason that he had no
obligation to disclose the physical Merrick hangers (or images of
those physical hangers) to the examiner.

A071.  The record quite clearly shows that trial court's conclusion of *ex post facto*

rationalization is wrong: from the outset, Attorney Sonnabend – and Worldwide –

explained the basis for Attorney Sonnabend's actions.

Worldwide first explained the basis for withholding information about the

C90610 hangers during its 30(b)(6) deposition on March 29, 2012, testifying:

> Q. And did you make a determination to not supply the patent
> examiner with Exhibit 11 [Cohesion' April 27, 2011 Letter]?
>
> A. Well, again *we couldn't determine if this was prior art*. And
> number two, the way this picture shows you can see the hangers are
> all out of whack so that will affect whether the hooks touch or not.
> The product that we saw and we held and we looked at when held in a
> horizontal plane properly did not touch.

A133-A134. (emphasis added).

Following this, Attorney Sonnabend first explained his basis for withholding

information about the C90610 hangers in Worldwide's January 17th, 2012 motion

to quash Defendants' subpoena for the deposition of Attorney Sonnabend.  See

A201-A212, A215-A216.  Attorney Sonnabend repeated the argument *directly to*

*Judge Swain* on April 8, 2012, in a Rule 72 motion appealing the magistrate

judge's denial of the motion to quash.  See A218-A237.  Finally, Attorney

Sonnabend explained the reasons for his actions during his deposition (which

Judge Swain ordered after considering and denying the aforementioned Rule 72

motion).  Attorney Sonnabend testified under oath:

Q  Well, you had hangers in your possession; did you not?

A  You said offered for sale.

Q  Right.

A  That's not the question. The question is, is the fact that it [the
hanger image] was on the website enough to show that it was –  that
the hanger itself was prior art.

And the answer is, no, because unless the product was known and
used by others[, others] cannot manipulate it the way Eclipse did to
make a determinations that Eclipse did, whether those determinations
are right or wrong.

So the mere fact that it was quote, offered for sale, unquote, doesn't
give anyone the ability to determine what the hanger product itself
does or does not do. How or how it does not function.

. . .

Q  Yes. You knew the offer for sale – it was an offer for sale, but the
web page referenced a specific hanger by number?

A I did not communicate about anything about the April 27, 2011
letter to the patent examiner.

Q Uh-huh.

A *Because I could not determine that the hanger product was prior
art.* I could not determine that the product was known or used by
others within the United States more than one year prior to the critical
date or before the date of invention by the -- by the patent applicant.
Therefore, I did not submit any information in the April 27th letter

33

which itself does not provide a date that the product was known or used by others.

A193-A194 (emphasis added).

The trial court ignored Worldwide's and Attorney Sonnabend's consistent explanation of his decisions, instead characterizing Attorney Sonnabend's explanation as an 11th hour, *ex post facto* rationalization and dismissing it out of hand as a result.  This is error.

**c    THE TRIAL COURT ERRED BY FINDING INTENT BECAUSE IT (INCORRECTLY) FOUND ATTORNEY SONNABEND'S LEGAL POSITION FLAWED**

The trial court erred by failing to consider Attorney Sonnabend's reasonable, rational explanation for his actions, and further by characterizing his explanation as an 11th hour, *ex post facto* rationalization.  The trial court's error is further compounded by its finding of intent to deceive based on its determination that Attorney Sonnabend's legal analysis is legally unsound.  Attorney Sonnabend's legal analysis is in fact legally sound, but regardless, the question of the correctness of the his understanding of the law is irrelevant to the question of intent to deceive.

First and foremost, the trial court fundamentally misconstrued *American Calcar* in determining Attorney Sonnabend's position to be legally flawed. Properly understood, *American Calcar* does not stand for the proposition put forth

34

by the trial court, and its facts and holdings do not demonstrate that Attorney

Sonnabend misconstrued the law (nor do they support the trial court's conclusion

of intent to deceive).

The trial court stated its reliance on *American Calcar* as follows:

> Plaintiff's argument that it could properly withhold the physical
> embodiments of referenced prior art is baseless. . . . Here, Mr.
> Sonnabend prosecuted the patent in much the same way [as the party
> in the cited *American Calcar* case], offering the low-resolution
> photographs wherein the abutting cascade hooks are not visible, but
> failing to disclose either the physical Merrick Hangers or higher
> resolution photographs, in order to lead the PTO examiner into
> allowing his Claims 1 and 14 based on the false representation that the
> hangers depicted in the Merrick Reference did not have abutting
> cascading hooks.

A084.  The trial court draws here a false parallel between the present facts and

those of *American Calcar,* and it misconstrues the holding of *American Calcar*.

In *American Calcar*, the patent concerned "a multimedia system for use in a

car to access vehicle information and control vehicle functions.  768 F.3d at 1187.

Prior to filing the patent application, the patent applicant had obtained a Honda

vehicle with such a multimedia system, as well as the owner's manual for the

system.  *Id*.  The applicant then filed a patent application for a similar multimedia

system, citing the Honda multimedia system as prior art.  *Id*.  Importantly, the

applicant disclosed to the Patent Office benign information contained in the prior

art owner's manual but withheld damning information the applicant had learned

from its hands-on the operation of the physical embodiment of the prior art

multimedia system. *Id.*   In other words, both the withheld information and the disclosed information concerned the very same, established prior art reference, namely, the Honda multimedia system that had been in the applicant's possession prior to filing the application. *Id.*

Based on the foregoing facts, this Court upheld in *American Calcar* the district court's finding of intent to deceive. *Id.* at 1190.   This Court's decision hinged on the fact that the all the information at issue – both the disclosed information and the withheld information – concerned the very same prior art. This Court held that "[p]artial disclosure of material information about *the prior art* to the PTO cannot absolve a patentee of intent if the disclosure is intentionally selective." *Id.* (emphasis added).

The facts of *American Calcar* differ critically from the present case.   In the present case, the information that had been submitted to the Patent Office concerned a reference determined to be prior art (the printed reference concerning the C90601 hanger) while the withheld information concerned a different product never shown to be prior art (the C90610 hanger product).   The trial court expressly acknowledged this distinction, stating:

> Mr. Poms was clearly as mistaken as the parties and the Court in characterizing the physical hangers provided to Mr. Sonnabend by Defendants' counsel [the C90610 hanger] as the same models as those depicted in the brochure Merrick Reference [the C90601 hanger], *and it is not clear that the physical hangers [i.e., the C90610 hangers] possessed by Mr. Sonnabend themselves constituted a prior reference*

36

A076-A077 (emphasis added).  Thus, the trial court acknowledged that the information withheld concerned a different reference (and an outright different product) from the prior art previously disclosed to the examiner.  The case is thus wholly unlike *American Calcar*, where the applicant had two pieces of information about the same, established prior art, but selectively chose to submit only one piece of information to the Patent Office.  The trial court here missed this distinction, and in so doing misapplied *Americn Calcar* to the present case.

Attorney Sonnabend's argument was never that he was permitted to "properly withhold the physical embodiments of referenced prior art", A084, as occurred in *American Calcar*.  Instead, as discussed in the preceding sections, Attorney Sonnabend argued only that the physical hanger product in his possession (the C90610 hanger) was a different reference from the printed publication (concerning the C90601 hanger), and so he was under no obligation to disclose information about the former (which was not shown to be prior art) regardless of the prior-art status of the latter (which was shown to be prior art).  The trial court thus erred in trying to force the square peg of this case through the round hole of *American Calcar*.  *American Calcar* does not refute Attorney Sonnabend's position.

Second, regardless of whether Attorney Sonnabend's understanding of the law may have been flawed (which it was not), that conclusion does not lead to a

finding of intent to deceive.  To the contrary, this Court has made clear that an

incorrect legal understanding, even if grossly negligent in nature, does not support

a finding of intent to deceive.  *Outside the Box Innovations, LLC*, 695 F.3d at 1292;

*Therasense,* 649 F.3d at 1290 (citing  *Kingsdown Med. Consultants, Ltd. v.*

*Hollister Inc.,* 863 F.2d 867, 876 (Fed. Cir. 1988)).  Thus, even if the trial court

were correct that Attorney Sonnabend acted on a flawed understanding of the law,

such a finding would not support a conclusion of intent to deceive.  The trial court

thus erred.

## C    THE TRIAL COURT WAS WRONG TO ADMIT AND RELY ON THE POMS REPORT

Rule 702 of the Federal Rules of Evidence controls the admissibility of

expert testimony in the federal courts.  *Daubert v. Merrell Dow Pharmaceuticals,*

*Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 2799, 125 L. Ed. 2d 469 (1993); *Nimely*

*v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005).[11]  Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue,
> a witness qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form of an opinion or
> otherwise, if (1) the testimony is based upon sufficient facts or data,
> (2) the testimony is the product of reliable principles and methods,

---

[11] Although this case is a patent case appealable to the Federal Circuit, the law of
the regional circuit of the trial court is applied to general evidentiary matters
such as *Daubert* rulings.  *See., e.g., i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d
831, 841 (Fed. Cir. 2010) *aff'd,* 131 S. Ct. 2238, 180 L. Ed. 2d 131 (2011) ( *"For
issues not unique to patent law, we apply the law of the regional circuit in which
this appeal would otherwise lie."*).

and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  As a result, Rule 702 places two broad requirements on expert testimony: (1) that it be for the purpose of "assist[ing] the trier of fact", and (2) that it be reliable.  *Daubert*, 509 U.S. at 591.

As the preceding discussion of the inequitable conduct ruling illustrates, the trial court admitted and relied on the Poms Report despite the fact that the Poms Report: (1) applied the wrong standard for materiality; (2) improperly inferred intent based on suppositions of what "must have been said" to the examiner by Attorney Sonnabend; and (3) misunderstood the withheld information to be concerning "prior art" (the C90601 hanger) when it in fact concerned non-prior art (the C90610 hanger).

The trial court also erred in admitting and relying on the Poms Report on the issue of materiality because Mr. Poms is not one of skill in the art and so cannot opine on "but for" materiality under 35 U.S.C. §§ 102 and 103.

Finally, Mr. Poms concluded in his report that Attorney Sonnabend acted with "intent to deceive the Patent Office."  A105.  Mr. Poms, however, provides no reasonable factual basis for such a conclusion because he cannot.  Quite simply, Mr. Poms is not a mind-reader, and, lacking such credentials, he is wholly incapable of opining on whether or not Attorney Sonnabend intended to deceive the Patent Office.  *See Se-Kure Controls, Inc. v. Diam USA, Inc.*, 2009 WL 77463

39

at *2 (N.D. Ill. Jan. 9, 2009)  ("Mr. Gerstman is also not a mind-reader. He may not testify that he knows Se-Kure's intent to hide certain information nor may he testify that he knows Se-Kure lied about certain information."); *Bone Care Int'l LLC v. Pentech Pharmaceuticals, Inc.,* 2010 WL 3928598 at * 9 (N.D. Ill. Oct. 1, 2010) ("Dr. Keana's education, training, and experience, however, do not qualify him with the expertise to plumb the inventor's and attorneys' minds and discern whether they 'lacked candor' or had actual intent to deceive during prosecution of the '488 and related applications.").

Not being a mind-reader, the best Mr. Poms can do regarding Attorney Sonnabend's intent is to review the circumstantial evidence and apply the standards detailed in *Therasense* (i.e., whether or not the sole inference to be drawn from the evidence requires a finding of deceitful intent) to make the ultimate legal determination of intent.  As a non-mind-reading expert, Mr. Poms has no greater expertise in analyzing this evidence than the jury, and consequently he is not permitted to "merely tell the jury what result to reach" on the question of Attorney Sonnabend's intent.

**VIII  CONCLUSION**

As the foregoing makes clear, the trial court erred grievously in finding inequitable conduct.  The trial court's ruling failed to find by clear and convincing evidence either "but for" materiality or intent to deceive.  For this reason, the

finding of inequitable conduct must be reversed and a finding of no inequitable

conduct must be mandated as a matter of law.  In the alternative, the summary

judgment of inequitable conduct must be reversed and remanded for resolution of

material issues of fact, including both "but for" materiality and intent to deceive.

Similarly, the trial court's denial of the *Daubert* motion on the testimony of

Mr. Poms must be reversed.

Dated: June 18, 2015

Movant-Appellant
Jeffrey Sonnabend,

_____
Jeffrey Sonnabend
SonnabendLaw
600 Prospect Avenue
Brooklyn, NY 11215-6012
718-832-8810
JSonnabend@SonnabendLaw.com

# ADDENDUM



US007938300B2

(12) **United States Patent**
Diamond et al.

(10) Patent No.: **US 7,938,300 B2**
(45) Date of Patent: **May 10, 2011**

(54) **NESTABLE HANGER WITH INTEGRATED CASCADE HOOK**

(75) Inventors: **Aaron Diamond**, Hollis Hills, NY (US); **Robert Doherty**, Northport, NY (US)

(73) Assignee: **Worldwide Home Products, Inc.**, Ronkonkoma, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/182,351**

(22) Filed: **Jul. 30, 2008**

(65) **Prior Publication Data**

US 2010/0025439 A1    Feb. 4, 2010

(51) **Int. Cl.**
*A41D 27/22*      (2006.01)

(52) **U.S. Cl.** .......................................... **223/85**; 223/88

(58) **Field of Classification Search** .................. 223/85, 223/88, 92, 95; D6/315, 317, 318, 319
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,580,839 A | 4/1926 | McKenna | |
| 2,658,627 A | 11/1953 | Magnuson | |
| 3,148,809 A * | 9/1964 | Tufts | 223/87 |
| D276,967 S * | 1/1985 | Arnold et al. | D6/327 |
| 4,653,678 A | 3/1987 | Blanchard | |
| 4,714,183 A | 12/1987 | Tontarelli | |
| D295,579 S * | 5/1988 | Arnold | D6/317 |
| 4,871,098 A | 10/1989 | Bredeweg | |
| 5,029,739 A | 7/1991 | Blanchard | |
| 5,074,445 A | 12/1991 | Chen | |
| 5,074,446 A | 12/1991 | Suddath | |
| 5,584,455 A | 12/1996 | Artemi | |
| 5,613,628 A | 3/1997 | Burkhalter | |
| 5,645,200 A | 7/1997 | McDowell | |
| 5,803,321 A | 9/1998 | Willinger | |
| D419,310 S * | 1/2000 | Abdi | D6/317 |
| 6,036,064 A | 3/2000 | Tawil | |
| 6,070,772 A | 6/2000 | Bond | |
| 6,105,834 A | 8/2000 | Cohen | |
| 6,308,872 B1 | 10/2001 | Duerr | |
| 6,457,615 B1 * | 10/2002 | Lam | 223/89 |
| 6,467,658 B1 | 10/2002 | Olk | |
| 6,497,347 B1 | 12/2002 | Feibelman | |
| 6,688,503 B2 * | 2/2004 | Viazanko et al. | 223/89 |
| 2003/0132258 A1 * | 7/2003 | Viazanko et al. | 223/85 |
| 2008/0197160 A1 * | 8/2008 | Lee | 223/85 |
| 2008/0257919 A1 * | 10/2008 | Yamada | 223/85 |

OTHER PUBLICATIONS

Merrick Engineering Products, http://www.merrickengineering. com/product.html, Aug. 10, 2006.*

* cited by examiner

*Primary Examiner* — Gary L. Welch
*Assistant Examiner* — Nathan E Durham
(74) *Attorney, Agent, or Firm* — Jeffrey Sonnabend; SonnabendLaw

(57)         **ABSTRACT**

A hanger is disclosed having a hanger supporting means in the form of a cascade hook for supporting additional hangers therefrom, wherein the cascade hook may be inserted through a rear aperture of a like hanger to facilitate the nesting of one hanger with the other like hanger.

**24 Claims, 5 Drawing Sheets**





Fig. 1



Fig. 2



Fig. 3



Fig. 4



Fig. 5A

Fig. 5



Fig. 6A

Fig. 6



Fig. 7

Fig. 7A

1

# NESTABLE HANGER WITH INTEGRATED CASCADE HOOK

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention pertains to the field of clothing hangers and in particular to the field of nestable hangers having hanger supporting means for supporting additional hangers therefrom.

2. Background of the Related Art

Hangers having nestable configurations are disclosed in the prior art, as are hangers having hanger supporting means for supporting additional hangers therefrom.

One example of a hanger having hanger supporting means for supporting additional hangers therefrom may be found, for instance, in U.S. Pat. No. 4,653,678 to Blanchard et al., which discloses a "ganging hook" via which additional hangers may be supported. The "ganging hook" disclosed in Blanchard et al. extends downwardly from the hanger body. The "ganging hook" of Blanchard et al. does not provide any nesting functionality.

Another example of a hanger having supporting means for supporting additional hangers therefrom is U.S. Pat. No. 4,871,098 to Bredeweg et al. The hanger disclosed in Bredeweg et al. discloses a "hook socket for ganging hangers." As with Blanchard et al., the "hook socket" of the hanger disclosed in Bredeweg et al. extends downwardly from hanger body and does not provide any nesting functionality.

U.S. Pat. No. 5,074,445 to Chen discloses a garment hanger with a "ganging hook" extending from the hanger body. The position of the "ganging hook" of Chen impedes nesting of hangers.

Similarly, U.S. Pat. No. 5,803,321 to Willinger et al. discloses a hanger having "ganging element" extending downwardly from the hanger body. As with the previously cited prior art, the "ganging element" of the hanger disclosed in Willinger et al. does not promote nesting of hangers. Like hangers may also be found in U.S. Pat. No. 6,070,772 to Bond; U.S. Pat. No. 6,105,834 to Cohen; U.S. Pat. No. 6,308,872 to Duerr et al.; and U.S. Pat. No. 6,467,658 to Olk et al.

None of the foregoing prior art discloses hangers with hanger supporting means for supporting additional hangers therefrom configured in such a manner so as to allow for nesting of hangers. It is therefore desirable to have a hanger which not only includes hanger supporting means for supporting additional hangers therefrom, but further readily provides for nesting of hangers.

## SUMMARY OF THE INVENTION

The subject invention is directed to a new and useful hanger having a hanger supporting means in the form of a cascade hook for supporting additional hangers therefrom, wherein the cascade hook facilitate the nesting of one hanger with another similar hanger.

One embodiment of the present invention includes a garment hanger comprising: a hanger frame comprising a hanger body, the hanger body having a front surface and a rear surface, a top and a bottom; a hook member extending from the top of the hanger body, the body having a hole formed therethrough, the hole having a front aperture formed in the front surface and a rear aperture formed in the rear surface; the body having a cascade hook member extending from the front surface and disposed in front of the front aperture. In these embodiments, the hole is adapted to receive through the rear aperture a cascade hook member from a first identical gar-

2

ment hanger and the cascade hook member is adapted to be inserted into a rear aperture of a hole in a second identical garment hanger.

In certain embodiments, the cascade hook member has an inclined portion having a first end disposed at the bottom of the hole and a second end disposed opposite from the first end, and a second portion extending upwardly from the second end of the inclined portion.

In any of the foregoing embodiments, the cascade hook member may comprise a rear surface substantially facing the front surface of the body; a front surface substantially facing away from the front surface of the body. A projection of the cascade hook member onto a plane containing the front surface of the body may be shaped substantially the same as the front aperture, and the projection may have an area less than the area of the front aperture. The rear aperture may have an area greater than the area of the of the front aperture. There may also be a concavity formed in the rear surface of the cascade hook member.

Furthermore, in any of the foregoing embodiments, the cascade hook member may be adapted to be inserted through the hole of the second identical garment hanger and extend out of a front aperture of the hole of the second identical garment hanger. Upon being inserted through the hole of the second identical garment hanger, the front surface of the cascade hook member may abut a portion of a rear surface of a cascade hanger member of the second identical garment hanger.

A channel may be formed between a portion of the front surface of the cascade hook member and a portion of the rear surface of the cascade hook member of the second identical hanger. Similarly, a cavity may be formed between a portion of the front surface of the cascade hook member and a concavity formed in the rear surface of the cascade hook member of the second identical hanger. Where both a cavity and a channel are formed, the width of the channel may be smaller than the width of the cavity.

These and other aspects of the subject invention will become more readily apparent to those having ordinary skill in the art from the following detailed description of the invention taken in conjunction with the drawings described herein.

## BRIEF DESCRIPTION OF THE DRAWINGS

So that those having ordinary skill in the art to which the subject invention pertains will more readily understand how to make and use the subject invention, preferred embodiments thereof will be described in detail herein with reference to the drawings.

FIG. 1 is a front plan view of a preferred embodiment of the present invention.

FIG. 2 is a cross-sectional detail of the preferred embodiment depicted in FIG. 1.

FIG. 3 is a front plan view of two hangers of a preferred embodiment of the present invention shown in a nested configuration.

FIG. 4 is a cross-sectional detail of the hangers depicted in FIG. 3.

FIG. 5 is an orthogonal view of two hangers of a preferred embodiment of the present invention shown in a nested configuration.

FIG. 6 is an orthogonal view of two hangers of a preferred embodiment of the present invention shown in a cascaded configuration.

US 7,938,300 B2

**3**

FIG. **7** is a substantially rear orthogonal view of a preferred embodiment of the present invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention now will be described more fully hereinafter with reference to the accompanying drawings, in which preferred embodiments of the invention are shown. This invention may, however, be embodied in many different forms and should not be construed as limited to the embodiments set forth herein; rather, these embodiments are provided so that this disclosure will be thorough and complete, and will fully convey the scope of the invention to those skilled in the art.

Referring to FIGS. **1** and **2**, FIG. **1** depicts a front plan view of a preferred embodiment of the present invention. The hanger generally comprises hanger frame **1** and hook member **2** extending upwardly therefrom. Hanger frame comprises body **4** and arms **5** extending from each side of body **4**. Hook member **2** is connected to frame **1** via vertical portion **3**.

Hanger body **4** includes a generally planar front surface **10** and a rear surface **11** substantially collateral with front surface **10**. Cascade hook **20**, which may also be called a "finger", extends from front surface **10**.

Cascade hook **20**, shown in cross section in FIG. **2**, has a front surface **21** and a rear surface **22**, a vertical portion **27** substantially collateral with front surface **10** of hanger body **4** and an inclined portion **28** extending upwardly and outwardly from front surface **10** of hanger body **4**. Inclined portion **28** may form an angle of less than 90 degrees from vertical (i.e., less than 90 degrees from the plane of front surface **10**). Cascade hook **20** may omit a vertical portion, and inclined portion **28** may be arranged perpendicularly to front surface **10** without departing from the invention disclosed herein, provided that cascade hook **20** may function to support additional hangers therefrom and allows for nesting of hangers, as will be described in greater detail below.

Cascade hook **20** may include a concavity **23**, which may be formed at the intersection of the vertical portion **27** and inclined portion **28**. Alternatively, concavity **23** may be omitted.

Body **4** includes a hole **26** formed therethrough. Hole **26** has a rear aperture **24** formed in the rear surface **11** and a front aperture **25** formed in front surface **10**. Rear aperture **24** may include chamfer **30** (depicted more clearly in FIG. **7**). Each of the front and rear apertures have a certain area, that is, each has a certain measure of the planar extent it defines. Cascade hook **20** is shaped substantially the same as front aperture **25**, that is, if one projects the shape of cascade hook **20** on the same plane as that occupied by aperture **25** (which is the same as the plane of front surface **10**), the projected shape of cascade hook **20** will be substantially the same as the shape of aperture **25**. One in the art will readily understand that the projection disclosed herein is not a physical structure, but instead an orthographic projection, that is, a representation of the three dimensional cascade hook **20** on a planar surface corresponding to the plane containing aperture **25**.

Front surface **10** may also be curved, in which case apertures **24** and **25** would likewise be curved. In this case, the projection of cascade hook **20** onto a plane would have substantially the same shape as a projection of aperture **25** onto the same plane.

The surface area of front surface **10** which is not occupied by cascade hook **20** may be at least approximately twice that of the surface area occupied by cascade hook **20**.

**4**

Referring now to FIGS. **3** and **4**, two hangers of a preferred embodiment of the present invention may be seen in a nested configuration. Hanger **50** is placed in front of hanger **60**, which is nested with hanger **50**. Cascade hook **61** of hanger **60** extends through rear aperture **52** of hanger **50**, through hole **53**, and partially out front aperture **54** of hanger **50**. Front surface **60** of the inclined portion of cascade hook **61** abuts rear surface **55** of cascade hook **51**. Front surface **62** of hanger **60** abuts rear surface **56** of hanger **50**. Cascade hook **61** may be dimensioned to closely conform to the dimensions of front aperture **54**, thereby nesting hanger **60** to hanger **50**. Rear aperture **53** may be dimensioned larger than front aperture **54** to more easily receive cascade hook **61** in hole **53**.

When nested as shown in FIGS. **3**, **4**, and **5**, cascade hooks **51** and **61** form channel **71** therebetween, terminating in cavity **72**, formed in part by concavity **73** and the front face of cascade hook **61**. Concavity **73** may be dimensioned so as to hold a hook member of another hanger therein, while channel **71** may be of smaller dimensions, prohibiting a hook member present in cavity **72** from moving through channel **71**, thereby maintaining the hook member in cavity **72**. Cavity **72** may be dimensioned to closely approximate the diameter of hook member **2**, depicted, for example, in FIGS. **1** and **6**.

While particular embodiments of the present invention have been shown and described, it will be apparent to those skilled in the pertinent art that changes and modifications may be made without departing from the invention in its broader aspects.

What is claimed is:

**1**. A pair of substantially identical nested first and second garment hangers, each said first and second garment hanger comprising:

a hanger frame comprising a hanger body, said hanger body having a front surface and a rear surface, a top and a bottom;

a hook member extending from said top of said hanger body,

a cascade hook member having a top surface and a bottom surface, said cascade hook member extending from said front surface;

said body having a hole formed therethrough, said hole having a front aperture formed in said front surface and a rear aperture formed in said rear surface;

wherein

said cascade hook member of said first hanger extends through said hole of said second hanger and said front surface of said first hanger abuts against a rear surface of said second hanger,

the bottom surface of the cascade hook member of said first hanger abuts the top surface of the cascade hook member of said second hanger, and

the top and bottom portion of each said first and second hangers is nested and affixed in a common horizontal plane relative to one another.

**2**. The pair of first and second garment hangers of claim **1**, wherein said cascade hook member comprises:

a rear surface substantially facing said front surface of said body;

a front surface substantially facing away from said front surface of said body;

wherein a projection of said cascade hook member onto a plane containing said front surface of said body is shaped and sized substantially the same as said front aperture, and said projection has an area less than the area of said front aperture and said aperture is sized to allow said cascade hook member to fit within said aperture.

**3**. The pair of first and second garment hangers of claim **2**, wherein said rear aperture has an area greater than the area of said of said front aperture.

**4**. The pair of first and second garment hangers of claim **3**, further comprising a concavity formed in said rear surface of said cascade hook member.

**5**. The pair of first and second garment hangers of claim **2**, wherein said cascade hook member is further adapted to be inserted through said hole of said second identical garment hanger and extend out of a front aperture of said hole of said second identical garment hanger.

**6**. The pair of first and second garment hangers of claim **5**, wherein said rear aperture has an area greater than the area of said of said front aperture.

**7**. The pair of first and second garment hangers of claim **6**, further comprising a concavity formed in said rear surface of said cascade hook member.

**8**. The pair of first and second garment hangers of claim **5**, further comprising a concavity formed in said rear surface of said cascade hook member.

**9**. The pair of first and second garment hangers of claim **8**, wherein said front surface of said cascade hook member, upon being inserted through said hole of said second garment hanger, forms a channel between a portion of said front surface of said cascade hook member and a portion of said rear surface of said cascade hook member of said second hanger.

**10**. The pair of first and second garment hangers of claim **9**, wherein said front surface of said cascade hook member, upon being inserted through said hole of said second garment hanger, forms a cavity between a portion of said front surface of said cascade hook member and a concavity formed in said rear surface of said cascade hook member of said second hanger.

**11**. The pair of first and second garment hangers of claim **10**, wherein the width of said channel is less than the width of said cavity.

**12**. The pair of first and second garment hangers of claim **8**, wherein said front surface of said cascade hook member, upon being inserted through said hole of said second garment hanger, forms a cavity between a portion of said front surface of said cascade hook member and a concavity formed in said rear surface of said cascade hook member of said second hanger.

**13**. A pair of substantially identical nested first and second garment hangers, each said first and second garment hanger comprising:

   a hanger frame comprising a hanger body, said hanger body having a front surface and a rear surface, a top and a bottom;

   a hook member extending from said top of said hanger body,

   said body having a hole formed therethrough, said hole having a top and bottom, a front aperture formed in said front surface and a rear aperture formed in said rear surface;

   said body having a cascade hook member extending from said front surface and disposed in front of said front aperture, said cascade hook member comprising:

   an inclined portion having a first end disposed at said bottom of said hole and a second end disposed opposite from said first end;

   a top surface and a bottom surface;

   a second portion extending upwardly from said second end of said inclined portion, wherein said cascade hook of said first hanger extends through said rear aperture in said second garment hanger such that said first and sec-

ond garment hangers are nested and affixed to one another and the bottom surface of the cascade hook of said first hanger abuts the top surface of the cascade hook of said second hanger and said front surface of said first hanger abuts against said rear surface of said second hanger with the top and bottom portion of each first and second hangers being nested and affixed in a common horizontal plane relative to one another.

**14**. The pair of first and second garment hangers of claim **13**, wherein said cascade hook member further comprises:

   a rear surface substantially facing said front surface of said body;

   a front surface substantially facing away from said front surface of said body;

   wherein a projection of said cascade hook member onto a plane containing said front surface of said body is shaped and sized substantially the same as said front aperture, and said projection has an area less than the area of said front aperture and said aperture is sized to allow said cascade hook member to fit within said aperture.

**15**. The pair of first and second garment hangers of claim **14**, wherein said rear aperture has an area greater than the area of said of said front aperture.

**16**. The pair of first and second garment hangers of claim **15**, further comprising a concavity formed in said rear surface of said cascade hook member.

**17**. The pair of first and second garment hangers of claim **14**, wherein said cascade hook member is further adapted to be inserted through said hole of said second garment hanger and extend out of a front aperture of said hole of said second garment hanger.

**18**. The pair of first and second garment hangers of claim **17**, wherein said rear aperture has an area greater than the area of said of said front aperture.

**19**. The pair of first and second garment hangers of claim **18**, further comprising a concavity formed in said rear surface of said cascade hook member.

**20**. The pair of first and second garment hangers of claim **17**, further comprising a concavity formed in said rear surface of said cascade hook member.

**21**. The pair of first and second garment hangers of claim **20**, wherein said front surface of said cascade hook member, upon being inserted through said hole of said second garment hanger, forms a channel between a portion of said front surface of said cascade hook member and a portion of said rear surface of said cascade hook member of said second hanger.

**22**. The pair of first and second garment hangers of claim **20**, wherein said front surface of said cascade hook member, upon being inserted through said hole of said second garment hanger, forms a cavity between a portion of said front surface of said cascade hook member and a concavity formed in said rear surface of said cascade hook member of said second hanger.

**23**. The pair of first and second garment hangers of claim **22**, wherein said front surface of said cascade hook member, upon being inserted through said hole of said second garment hanger, forms a cavity between a portion of said front surface of said cascade hook member and a concavity formed in said rear surface of said cascade hook member of said second hanger.

**24**. The pair of first and second garment hangers of claim **23**, wherein the width of said channel is less than the width of said cavity.

\*    \*    \*    \*    \*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

WORLDWIDE HOME PRODUCTS, INC.,

              Plaintiff,

    -v-                              No.  11CV3633-LTS-MHD

BED, BATH AND BEYOND, INC., et al.,

              Defendants.

--------------------------------------------------------x

MEMORANDUM OPINION AND ORDER

      Plaintiff Worldwide Home Products, Inc. ("Plaintiff") sought, in this litigation, to enforce its '300 patent.  The Court has granted summary judgment in favor of Defendants Bed, Bath & Beyond, Inc., and Cohesion Products, Inc. ("Defendants"), invalidating the '300 Patent for inequitable conduct, finding non-infringement and dismissing Plaintiff's claims.  Defendants now bring this motion seeking, pursuant to 35 U.S.C. section 285 and the Court's inherent power, to recover from Plaintiff $875,415.15 in attorneys' fees and related expenses that Defendants incurred while defending this lawsuit.  Defendants also assert that Plaintiff's former attorney, Jeffrey Sonnabend, Esq., should held jointly and severally liable for the award pursuant to 28 U.S.C. section 1927.  Plaintiff and Mr. Sonnabend each have opposed the motion.

      The Court has thoroughly reviewed all of the submissions in connection with this motion.  This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rules of Civil Procedure 52(a) and 54(d)(2)(C).  For the following reasons, the Court grants, in part, Defendants' motion for attorneys' fees and related expenses.  The Court finds that this is an exceptional case pursuant to 35 U.S.C. section

285 and that the fees and costs incurred are reasonable, but that expert witness fees are not available under section 285, and that an award of expert witness fees in the nature of sanctions is not warranted as against Plaintiff.  The Court further holds Mr. Sonnabend liable jointly and severally, pursuant to 28 U.S.C. section 1927, for the reasonable attorneys' fees and related expenses awarded to Defendants.

The '300 Patent is directed to a clothing hanger having an abutment feature with a "supporting means in the form of a cascade hook for supporting additional hangers therefrom." ('300 Patent at 1:52-54).  In an order entered on September 30, 2013 (the "September Order"), the Court granted summary judgment in Defendants' favor, finding that the uncontroverted factual record established that Plaintiff had engaged in inequitable conduct to procure the '300 Patent in that, during the prosecution of the patent, Plaintiff's counsel, Jeffrey Sonnabend, Esq., knowingly provided false information to the United States Patent and Trademark Office ("PTO") examiner concerning hangers that constituted prior art.  The Court reaffirmed this finding of misconduct in an amended order, docket entry number 256 (the "Amended Order"), wherein the Court granted Plaintiff's request for reconsideration of the September Order, and reaffirmed the summary judgment and the declaration that Plaintiff's patent is unenforceable as a product of inequitable conduct.  The Court found, inter alia, that the undisputed evidence of record required the conclusion that Plaintiff specifically intended to deceive the PTO in the patent prosecution process and that Defendants proved the "but-for materiality of the [key] reference and of Mr. Sonnabend's misrepresentations and withholding of crucial information concerning [another manufacturer's] attachable hanger products."  (Amended Order at 22.)

35 U.S.C. section 285 authorizes the court to award attorneys' fees to the prevailing party in "exceptional" patent cases.  The decision to award attorneys' fees involves a

two-step analysis.  First, the district court must determine whether the case is exceptional.

Cambridge Prods., Ltd. v. Penn Nutrients, Inc., 962 F.2d 1048, 1050 (Fed. Cir. 1992).  "[A]n

'exceptional' case is simply one that stands out from others with respect to the substantive

strength of a party's litigating position (considering both the governing law and the facts of the

case) or the unreasonable manner in which the case was litigated.  District courts may determine

whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the

totality of the circumstances."  Octane Fitness, LLC v. ICON Health & Fitness, Inc., 134 S. Ct.

1749, 1756 (2014).  In its Octane Fitness decision, the Supreme Court rejected a "rigid" standard

of exceptionalness under which courts had required a showing of "litigation-related misconduct

of an independently sanctionable magnitude or . . . that the litigation was both 'brought in

subjective bad faith' and 'objectively baseless.'"  Id., at 1756.  Instead, a district court should

consider nonexclusive factors including "frivolousness, motivation, objective unreasonableness

(both in the factual and in the legal components of the case) and the need in particular

circumstances to advance considerations of compensation and deterrence."  Fogerty v. Fantasy,

Inc., 510 U.S. 517, 535 (1994); see Octane Fitness, 134 S. Ct. at 1756.

   "[P]revailing on a claim of inequitable conduct often makes a case 'exceptional,'

leading potentially to an award of attorney fees under 35 U.S.C. § 285."  Therasense, Inc., v.

Becton, Dickinson & Co., 649 F.3d 1276, 1289 (Fed. Cir. 2011) (citing Brasseler, U.S.A.I, L.P.

v. Stryker Sales Corp., 267 F.3d 1370, 1380 (Fed. Cir. 2010)).  In Brasseler, the Federal Circuit

affirmed the grant of summary judgment for inequitable conduct against a patentee whose

attorney purposefully had withheld information known to be material from the Patent and

Trademark Office.  267 F.3d at 1385.  The Circuit further affirmed the district court's finding

that the case was exceptional under section 285, and that the patentee was liable for the

WORLDWIDE ATTORNEY FEES.WPD  VERSION 4/9/15            3

A055

defendant's reasonable fees.  Id.

Here, as in Brasseler, the Court has found on summary judgment that there was no genuine dispute of material fact as to inequitable conduct.  Mr. Sonnabend engaged in a pattern of inequitable conduct by willfully misrepresenting and selectively withholding information from the PTO examiner that he understood to be material.  Mr. Sonnabend then prosecuted the instant case on behalf of Plaintiff, alleging infringement of the wrongfully-procured patent.  Consequently, this is an exceptional case for purposes of a fee award under 35 U.S.C. section 285.

Notwithstanding Plaintiff's argument that it was acting solely on the advice of Mr. Sonnabend and therefore should not be held liable for Defendants' fees and expenses, parties are responsible for the actions of their attorneys in a litigation and Plaintiff is properly held liable under section 285 in this exceptional case.  See, e.g., Brasseler, 267 F.3d at 1385 (holding plaintiff liable under section 285 for attorneys' litigation conduct).  Having considered the relevant factors, the Court finds that this case involves precisely the type of litigation conduct – frivolous claims motivated by unbridled desire to gain an improper patent monopoly windfall – that should be deterred by courts through the shifting of fees.

Once the court determines that a party is entitled to an award of attorneys' fees, it then must decide whether the requested attorneys' fee award is reasonable by calculating the "lodestar," which is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  Lumen View Tech, LLC v. Findthebest.com, Inc., No. 13CV3599, 2014 WL 5389215, at *2 (S.D.N.Y. October 23, 2014) (citing Healy v. Leavitt, 485 F.3d 63, 71 (2d Cir. 2007)).  "The Federal Circuit has emphasized that a reasonable attorney fee is 'a determination that lies primarily within the discretion of the district court,' which may 'consider

all the relevant circumstances in a particular case.'"  Takeda Chem. Indus. v. Mylan Labs., Inc.,

No. 03CV8253, 2007 WL 840368, at *3 (S.D.N.Y. Mar. 21, 2007), aff'd, 549 F.3d 1381 (Fed.

Cir. 2008) (quoting Junker v. Eddings, 396 F.3d 1359, 1365–66 (Fed. Cir. 2005)).  In patent

infringement cases, the district court may also consider the American Intellectual Property Law

Association ("AIPLA") surveys of typical litigation costs.  See, e.g., Takeda Chem. Indust., 2007

WL 840368, at *3 (citing Mathis v. Spears, 857 F.2d 749, 755 (Fed. Cir. 1988)).

Defendants request an award in the amount of $875,472.15, comprised of

$739,743.09 in attorneys' fees and $135,729.06 in costs.  (See O'Connor Decl. at ¶ 3.)  The

AIPLA 2011 survey concluded that the average fees and costs for patent litigation through

discovery, but not including pre-trial or trial, is $1.6 million, where the amount in controversy

was between $1 million and $25 million.  The amount in controversy in this patent infringement

matter is in excess of one million dollars.  Accordingly, the AIPLA data indicate that

Defendants' total requested award, $875,472.15 – roughly half the average $1.6 million typically

incurred through discovery in comparable cases – is objectively reasonable.

Having reviewed Defendants' attorneys' time records and billing rates, the Court

finds that the lodestar computation properly includes all of the time billed and results in a

reasonable and appropriate fee award.  The billing rates for Defendants' attorneys are modest in

comparison to those often charged in litigation in this District by attorneys with comparable

experience.  The highest hourly rate billed was $550 for Edward F. O'Connor, Esq., lead counsel

with over forty years of experience.  The remainder of the attorneys utilized by defense counsel

billed between $300 to $400 per hour for counsel with over ten years' experience each, and $165

per hour for an associate with five years' experience.  The Court finds that these rates are

reasonable in light of the attorneys' respective levels of experience.  See TigerCandy Arts, Inc.

v. Blairson Corp., No. 09CV6215, 2012 WL 760168, at *9 (S.D.N.Y. Feb. 23, 2012) (finding

that $500 was a reasonable hourly rate for partner who "has been practicing law for twenty-eight

years, specializes in intellectual property law, and has been recognized as a skilled intellectual

property attorney by several organizations."); OZ Mgmt. LP v. Ozdeal Inv. Consultants, Inc.,

No. 09CV8665 2010 WL 5538552, at *3 (S.D.N.Y. Dec. 6, 2010) (finding that $657 per hour "is

well within the range of rates for law firm partners in the New York City area with significant

intellectual property law experience" and approving associate hourly rates of $395 to $435).

Defendants' primary counsel in this action were based outside of New York City, and appear to

have billed at their local rates rather than New York City rates.

   The time expended and costs incurred by defense counsel here are also reasonable

in light of the circumstances.  The majority of the hours for which defense counsel billed are for

the services of Uleses C. Henderson Jr., Esq.  Mr. Henderson is a senior counsel and has over ten

years of intellectual property law experience.  His hourly rate is $315, and is modest compared

with those of attorneys in the New York City area with comparable experience.  See OZ Mgmt.

LP, 2010 WL 5538552, at *3 (approving $395 to $435 associate rates in the New York City

area).  Defendants also seek recovery for Mr. O'Connor's time in a supervisory attorney role for

reviewing pleadings and attending conferences, and the Court finds that these supervisory time

expenditures were reasonable.  The Court has reviewed all of the objections to particular tasks

and time entries billed, and finds that the requested fees are in each case reasonable.

   Moreover, Defendants proffer that they "have in fact paid for all [requested

attorneys' fees] through August 30, 2013."  (Docket entry no. 238, at 18.)  The fact that

Defendants, which are sophisticated business entities, have paid the fees in full pursuant to the

fee arraignment with counsel is indicative of the reasonableness of the fees.  See Crescent Publ'g

Grp., Inc. v. Playboy Enterprises, Inc., 246 F.3d 142, 151 (2d Cir. 2001) ("[T]he actual billing arrangement is a significant, though not necessarily controlling, factor in determining what fee is 'reasonable.'").

   Plaintiff and Mr. Sonnabend each object to Defendants' request for reimbursement of $21,500 related to flat fee arrangements for opposing Plaintiff's motion pursuant to Federal Rule of Civil Procedure 59(e) to alter or amend the judgment and for prosecuting Defendants' instant motion to recover from Plaintiff attorneys' fees and related expenses. The Court has observed the extensive work expended by Defendants' counsel while litigating these motions, and finds that the time corresponding to these flat rate amounts is reasonable in relation to the work reflected in the submissions to the Court. See, e.g., Watson v. E.S. Sutton, Inc., No. 02CV02739, 2006 WL 6570643, at *12 (S.D.N.Y. Aug. 11, 2006), report and recommendation adopted as modified, No. 02 CV 2739, 2007 WL 2245432 (S.D.N.Y. Aug. 3, 2007) ("[A]lthough flat fees are usually disfavored, courts in this district have awarded attorneys fees in fee-shifting contexts where billing was done on a flat-fee basis, as long as the supporting documentation allowed the court to assess who performed the task, the nature of the task performed, and when the task was completed."). The Court further notes that Defendants' counsel proffers that the arrangement was designed to reduce the cost to Defendants of this frivolous case. This proffer is indicative of the reasonableness of the fees. The Court has reviewed the staffing as reflected on the submissions and, in light of the attorneys' billing rates as reflected in the other submissions and the magnitude of the work, finds the flat fees reasonable.

   Plaintiff objects to Defendants' expert witness fee request – specifically to $32,847.50 in fees for financial/damage expert witness David Notle and $24,500 in fees for

William Poms.  Section 285 does not authorize an award of expert fees.  Amsted Indus. Inc. v. Buckeye Steel Castings Co., 23 F.3d 374, 379 (Fed. Cir. 1994).  Such expenses may, however, be awarded as sanctions pursuant to the inherent powers of the court.  The courts' "authority to impose sanctions is grounded, first and foremost, in our inherent power to control the proceedings that take place before [the] Court."  Ransmeier v. Mariani, 718 F.3d 64, 68 (2d Cir. 2013) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 43-44 (1991)).  "These powers are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."  Id. (quoting NASCO, 501 U.S. at 43-44).  District courts, therefore, may sanction any party that has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  Id. (quoting NASCO, 501 U.S. at 43-44).

Nonetheless, "[t]he rule that the sins of the lawyer are visited on the client does not apply in the context of sanctions," and the court therefore must "specify conduct of the client [itself] that is bad enough to subject [it] to sanctions."  Id. (quoting Gallop v. Cheney, 660 F.3d 580, 584 (2d Cir. 2011)).  Here, the record with respect to Plaintiff's specific knowledge of Mr. Sonnabend's misconduct is insufficient to demonstrate that Plaintiff itself acted in bad faith.  The Court will not impose the requested sanction on Plaintiff.[1]

Plaintiff further objects to Defendants' additional requested litigation expenses, including costs of travel and delivery services.  The Court has reviewed these costs in detail and, in light of the hotly contested litigation, including multiple motions for summary judgment and an extensive Markman hearing, and the need to supply hard courtesy copies of electronic filings

---

[1]    Plaintiff also raises issues with certain purported irregularities in the bills of the experts.  The Court need not address the merits of those claims in light of its decision to deny this aspect of Defendants' request.

to the Court, finds these costs to be reasonable and thus compensable under section 285 in this exceptional case.

Defendants are therefore awarded a total of $818,124.65 ($739,743.09 in attorneys' fees and $78,381.56 in nontaxable expenses) in respect of their reasonable attorneys' fees and expenses incurred in defending this litigation, pursuant to 35 U.S.C. section 285.

The Court now turns to Defendants' request for an award against Plaintiff's former counsel, Mr. Sonnabend. Under 28 U.S.C. section 1927, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the [C]ourt to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." To impose a fee award pursuant to section 1927, "'a court must find clear evidence that (1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith – that is, motivated by improper purposes such as harassment or delay.'" Wynder v. McMahon, 565 F. App'x 11, 13 (2d Cir. 2014) (quoting Eisemann v. Greene, 204 F.3d 393, 396 (2d Cir. 2000)). "[A] claim is entirely without color when it lacks any legal or factual basis." Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 337 (2d Cir. 1999) (internal quotation marks omitted). "'[T]he court's factual findings of bad faith must be characterized by a high degree of specificity.'" Warhol, 194 F.3d at 338 (quoting Milltex Indus. Corp. v. Jacquard Lace Co., 55 F.3d 34, 38 (2d Cir. 1995)). Bad faith may be inferred, but "only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." Warhol, 194 F.3d at 336.

It is now clear that the infringement claims that Mr. Sonnabend prosecuted on Plaintiff's behalf were baseless from the start, in that they were premised on alleged violations of rights in a patent that Mr. Sonnabend had knowingly obtained through intentional inequitable

conduct.  Mr. Sonnabend knew that he had made material misstatements or omissions in

procuring the patent before he ever filed the Complaint, and he therefore understood that the

infringement claims had no proper foundation.[2]

Mr. Sonnabend's participation in bringing this action thus was also in bad faith.

In the Amended Order, the Court found that "[t]he only reasonable interpretation of the

circumstantial evidence concerning [Mr. Sonnabend's] October 12, 2010, conversation with the

examiner is that Mr. Sonnabend misrepresented to the [PTO] examiner the physical properties of

the actual Merrick hangers in his possession – specifically, that he told the examiner or

deliberately let the examiner believe that the tops and bottoms of the Merrick cascade hooks did

not abut in the nested configuration.  Such intentional deception of the examiner is grounds for

invalidation of the '300 patent."  (Amended Order at 17.)  Mr. Sonnabend prosecuted this

litigation very aggressively and ignored numerous opportunities to withdraw Plaintiff's claims.

His conduct was vexatious and in bad faith and is a proper predicate for the imposition of

sanctions pursuant to 28 U.S.C. section 1927.  Mr. Sonnabend's conduct during this litigation

was intended solely to maximize the commercial value of a patent that he himself had procured

through knowing and deliberate inequitable conduct.  He is therefore sanctioned pursuant to 28

U.S.C. section 1927 and held jointly and severally liable for the $818,124.65 in reasonable

---

[2]        Notwithstanding Mr. Sonnabend's contention that "[t]his Court's September 30, 2014
Decision on Defendants' [Federal Rule of Civil Procedure] 11 motion seeking
sanctions . . . confirms that Plaintiff's claims were colorable and brought in good
faith" (docket entry no. 291), that decision (docket entry 255) carries no such import.
Despite the fact that it was entered after Defendants' inequitable conduct motion was
filed, Defendants' claims of inequitable conduct were not raised in the Rule 11 motion
practice.  Rather, Defendants had argued that Plaintiff's pleading with respect to
allegedly infringing conduct of two additional parties was frivolous.  The Court
addressed only the arguments that had been raised in that Rule 11 motion practice.

attorneys' fees and expenses awarded to Defendants.[3]

In connection with this motion practice, the Court ordered Defendants "to show cause . . . as to why the . . . exhibits [to the O'Connor Declaration in support of the motion for attorneys' fees (docket entry no. 236)] should not be filed on the public ECF system in light of the First Amendment and common law rights of access to judicial documents." (Docket entry no. 266.) Defendants responded to this order on March 3, 2015, and Plaintiff opposed Defendants' response on March 4, 2015. (Docket entry nos. 271-72.) Defendants have not overcome the strong presumption of public access to court documents, except insofar as the documentation reflects sensitive personal or financial information and confidential third party pricing information. Defendants' proffers with respect to their counsel's confidential billing practices are insufficient to meet their burden. Attorneys understand that they may be required to disclose their fee statements, including the fee arrangements they have entered into with clients, particularly when they invoke fee-shifting statutes and doctrines under which the reasonableness of their fees is a material issue for adjudication. Defendants will be directed to file the O'Connor Declaration's exhibits on the public ECF system, appropriately redacted to protect confidential third-party pricing information. Personal identifiers and financial account information including credit card information, bank account numbers, and tax ID numbers must be redacted in accordance with Federal Rule of Civil Procedure 5.2. The full versions previously submitted will be filed under seal.

---

[3]    In his papers in opposition to Defendants' motion, Mr. Sonnabend requested an opportunity to make an in camera submission as to his financial condition prior to the Court's resolution of the motion. That request, which was unaccompanied by any representation whatsoever as to financial hardship or the state of Mr. Sonnabend's financial affairs, is denied. Mr. Sonnabend has already prolonged this baseless, bad faith litigation unduly.

CONCLUSION

For the foregoing reasons, the Court grants, in part, Defendants' motion for recovery of attorneys' fees and related expenses and holds Jeffrey Sonnabend jointly and severally liable with Plaintiff for these amounts.

Defendants are hereby awarded $818,124.65 in attorneys' fees and nontaxable litigation expenses as against Plaintiff Worldwide Home Products, Inc., and Jeffrey Sonnabend. The liability of Plaintiff and Mr. Sonnabend for the payment of this award is joint and several. The award must be paid in full within thirty (30) days of the entry of this Memorandum Opinion and Order.  Interest on any unpaid amount shall thereafter accrue in accordance with 28 U.S.C. section 1961.

Defendants are directed to file on the ECF system, within fourteen (14) days of entry of this Memorandum Opinion and Order, the Exhibits to the Declaration of Edward F. O'Connor (docket entry no. 236), appropriately redacted to protect confidential third-party pricing information.  Personal identifiers and financial account information, including credit card information, bank account numbers, and tax ID numbers, must be redacted in accordance with Federal Rule of Civil Procedure 5.2.

This Memorandum Opinion and Order resolves docket entry number 235, and this case remains closed.

SO ORDERED.

Dated: New York, New York
       April 9, 2015

   /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

WORLDWIDE HOME PRODUCTS, INC.,

               Plaintiff,

     -v-                             No.  11CV3633-LTS-MHD

BED, BATH AND BEYOND, INC. et al.,

               Defendant.

--------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER

       Plaintiff, Worldwide Home Products, Inc. ("Plaintiff"), moves pursuant to Federal Rule of Civil Procedure 59(e) to alter, amend, vacate, or set aside the September 30, 2013, Memorandum Opinion and Order (the "Order") and Clerk's Judgment entered by the Court in favor of Defendants, Bed, Bath & Beyond, Inc. and Cohesion Products Inc. (collectively, "Defendants").  In the Order, the Court granted summary judgment in Defendants' favor on Plaintiff's patent infringement claims and found that Plaintiff's patent, U.S. Patent Number 7,938,300 (the "'300 Patent"), was unenforceable due to inequitable conduct.  Plaintiff argues that the Order was based on an incorrect understanding of material facts and resulted in injustice.

## DECISION ON MOTION FOR RECONSIDERATION

       It appears that both the parties and the Court mistakenly believed that the serial numbers of certain physical embodiments of hangers made by the Merrick Engineering [Company] ("Merrick") and provided to Plaintiff's attorney by Defendant's counsel were the same as those of a Merrick hanger product depicted in a brochure that was prior art in relation to Plaintiff's claimed invention.  The evidence submitted in support of Plaintiff's Rule 59(e)

motion for reconsideration includes side-by-side photographs of the physical hangers associated

with the two different serial numbers – C90601 (the model number depicted in the prior art

brochure) and C90610 (the model number that was the subject of communications and

high-resolution photographs sent to Plaintiff by Defendants' counsel) – and testimony of

Merrick representatives and of Plaintiff's former attorney Jeffery Sonnabend.  The Court has

considered thoroughly all of the original motion submissions as well as all of the additional

material submitted in support of and in opposition to the motion for reconsideration.

In light of the mistake, the Court grants Plaintiff's motion for reconsideration.

Upon reconsideration, and for the reasons set forth below, the Court grants summary judgment

of invalidity in favor of Defendants, denies Plaintiff's motion to strike the inequitable conduct

defense and an expert report that had been proffered in support f Defendants' motion, and denies

Plaintiff's motion for summary judgment.

### DECISION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO STRIKE

The remainder of this Memorandum Opinion and Order supersedes, nunc pro

tunc, the Court's September 13, 2013, Order.

Plaintiff, Worldwide Home Products, Inc. ("Plaintiff"), brings this suit against

Defendants Bed, Bath and Beyond, Inc., and Cohesion Products Inc. ("Defendants"), for patent

infringement, claiming that the "Real Simple Slimline Hanger" (the "Slimline Hanger")

infringes upon U.S. Patent No. 7,938,300 (the "'300 Patent").  Defendants move pursuant to

Federal Rule of Civil Procedure 56 for summary judgment, asserting that the '300 Patent is

invalid because its allowance was procured through inequitable conduct.  Plaintiff moves for

summary judgment dismissing Defendants' inequitable conduct defense, asserting that

Defendants' evidence is insufficient to establish invalidity based on inequitable conduct.

Plaintiff also moves to strike the Report of William Poms (the "Poms Report"), which Defendants have proffered in support of their summary judgment motion, and for preclusion of any testimony by Mr. Poms.

For the following reasons, the Court denies Plaintiff's motion to strike the Poms Report and preclude Mr. Poms' testimony, denies Plaintiff's summary judgment motion, grants Defendants' motion for summary judgment declaring the '300 Patent invalid as the product of inequitable conduct and, accordingly, dismisses Plaintiff's infringement claims and directs entry of judgment in Defendants' favor.

Background[1]

The '300 Patent is directed to a clothing hanger having "supporting means in the form of a cascade hook for supporting additional hangers therefrom." ('300 Patent at 1:52-54.) Multiple units of the hanger can be arranged in two configurations. In the first configuration, the hangers are "nested" by placing one hanger in front of another and inserting the back hanger's "cascade hook" through a hole in the body of the front hanger. In the second configuration, one hanger dangles by its hook member from the other hanger's cascade hook member.

Defendants allege that Plaintiff engaged in inequitable conduct to procure the '300 Patent in that, during the prosecution of the patent, Plaintiff's counsel, Jeffrey Sonnabend, Esq., knowingly provided false information to the United States Patent and Trademark Office (the "PTO") examiner concerning the hangers depicted in a product brochure that constituted prior art.

Mr. Sonnabend prosecuted U.S. Application Serial No. 12/182,351 (the "Application"), which resulted in the issuance of the '300 Patent, beginning in July 2008. On

---

[1]    The following material facts are undisputed unless otherwise noted.

February 4, 2010, while the Application was still pending, Plaintiff sent Defendant Bed Bath and

Beyond a cease and desist letter asserting that the Slimline Hangers "will be deemed an

infringing product" because Plaintiff "fully expect[ed] the patent to issue in the coming months."

(Docket entry no. 142 (the "O'Connor Decl."), Exs. E and A-1-12.)  On April 27, 2010, Mr.

Sonnabend filed with the PTO an information disclosure statement (the "IDS") related to the

Application.  (Id. Ex. 2A.)  In the IDS, Sonnabend disclosed a website image of a printed

product brochure offering for sale certain Merrick hangers, product number C90601-A (the

"Merrick Reference"), showing hangers that had apparent similarities to the hanger that was the

subject of the Application; the brochure was undated.  (Id. Exs. A-2, A-3, and A-4.)  Plaintiff's

IDS identified the Merrick Reference as a Non-Patent Literature Document, describing it as a

"Product Brochure for MERRICK Hanger products (date unknown)."  The Merrick Reference

included low-resolution "thumbnail" images of six hangers that were nested together, labeled

with product identification number C90601-A.  Mr. Sonnabend was also in possession of a

physical version of the Merrick nesting hangers but did not provide any physical Merrick

hangers to the examiner.

On October 5, 2010, the PTO examiner rejected certain claims in the Application,

citing the Merrick Reference, which the examiner had dated to August 10, 2006, by using an

internet archive service.  (Id. Exs. A-6 and A-7.)  Among the claims rejected were claims 1, 2,

14, and 15.  In the notice of rejection, the examiner noted that the Merrick Reference teaches a

group of six identical hangers that are nested together.  (Id. Ex. A-5 at 5.)  Specifically,

regarding the Application's claims that the '300 Patent hangers abut one another for "easy

storage and transportation of hangers while also providing grouping of hangers for purchase,"

the PTO examiner observed that "MERRICK teaches a group . . . of identical garment hangers

(C90601-A12 or C90601-A) . . . being nested together . . . so that the front surface of one hanger abuts against a rear surface of another hanger wherein the top and bottom of both hanger are affixed in a common horizontal plane . . . Accordingly, it would have been obvious to a person of ordinary skill in the art to have provided . . . at least one second hanger where the front surface of the first hanger abuts against a rear surface of the second hanger with the top and bottom portion of each of the first and second hangers being nested and affixed in a common horizontal plane relative to one another . . . ." (O'Connor Decl., Ex. A-5, at 6).  The PTO examiner further noted that " MERRICK teaches such structure as shown in the blow up view of either C90601-A12 or C90601-A; however, regardless, the claim language of claims 5 and 10-13 is still in functional form wherein [a third-party patent] in view of MERRICK is completely capable of such function."  (Id. Ex. A-5 at 5-6.)

On October 12, 2010, Mr. Sonnabend discussed Application Claims 1, 2, 14, and 15 and the Merrick Reference in a telephone interview with the PTO examiner.  (Id. Ex. A-9 at 2.)  Mr. Sonnabend had physical Merrick hangers in his possession at the time of the telephone interview.  Following the interview, Mr. Sonnabend filed, with the PTO examiner, a document captioned "Amendment After Final," dated the same date as the interview (the "Amended Application"), that amended the Application's Claims 1 and 14, among others.  (Id. Ex. A-10 at 2, 6.)  Mr. Sonnabend asserted in the Amended Application that:

> Claim 1 and 14 have been amended to claim a cascade hook member having a top surface and a bottom surface, said cascade hook member extending from said front surface and the bottom surface of the cascade hook member of said first hanger abutting the top surface of the cascade hook member of said second hanger.  This distinguishes the claims from Arnold in view of Merrick.

(Id. Ex. A-10 at 8 (emphasis supplied).)  Fewer than two years later, on August 10, 2012, Mr. Sonnabend testified at his deposition taken in this litigation that he did not remember anything

that was said during the October 12, 2010, telephone interview with the PTO examiner.  (Id. Ex. B at 22.)  Mr. Sonnabend never disclosed any further information about the physical features of the Merrick hangers to the PTO examiner.  (Id. Ex. B at 45-46.)  There is nothing in the prosecution history or elsewhere in the evidentiary record on this motion practice to indicate that the examiner ever had access to any physical embodiment of the Merrick attachable hanger.  Mr. Sonnabend has confirmed under penalty of perjury, however, that he had some embodiment of the Merrick hanger,[2] and asserts that he declined to disclose it to the examiner simply because he had not confirmed that it was itself prior art, i.e., that it was offered for physical sale prior to the date of the Application.  He does not contend that the physical hanger that was in his possession prior to his conversation with the PTO examiner had a different attachment/nesting structure than the physical hangers of which Defendants' counsel later provided him high-resolution photographs.  (See Dec. 21, 2012 Sonnabend Decl., Ex. L to docket entry number 233 ("Rivkin Decl.").)

The side-by side detailed photographs of the two models of Merrick hanger that Mr. Sonnabend possessed show a substantially identical central nesting hook structure and surround (the C90601 model appears to have a "dimple" structure at the upper end of the cascade hook, which appears otherwise identical in shape and function to the C90610 hanger), and show differences in strap hooks on the outer arms of the hangers.  (Rivkin Decl. Ex. F.)  There is nothing in the record indicating that Merrick changed the design of its attachment/nesting structure at any relevant time.  Indeed, Merrick's Rule 30(b)(6) witness testified that the only

---

[1]    At the deposition, Mr. Sonnabend was asked: "[d]o you know whether you had in your possession actual Merrick hangers at the time you had this conversation with the examiner?"  He responded: "I believe that I did . . . . I'm willing to state on the record that I had it prior to that [interview with the PTO examiner]."  (Id.)

difference between the C90601 hangers and the C90610 hangers was pack size even though, on closer examination, differences may be observed in the dress strap configurations.  (Rivkin Decl., Exs. N, at 16-17 and F.)

Mr. Sonnabend testified that, although he had provided the Merrick Reference to the PTO examiner "out of an abundance of caution," he did not provide the examiner with the physical version of the hangers.  (Id.)  At the deposition Mr. Sonnabend refused, on the basis of attorney-client privilege, to explain his failure to provide the physical Merrick hangers to the PTO examiner.  (Id. Ex. B at 45-46.)  It was only later, in a December 21, 2012, affidavit proffered in support of Plaintiff's summary judgment motion, that Mr. Sonnabend asserted that he believes that the physical Merrick hangers that he possessed constituted a reference entirely separate from the Merrick Reference consisting of the website version of the hanger brochure, that he had been unable to determine whether the Merrick hangers, whose packaging the parties now acknowledge bears a slightly different product number from the product numbers listed on the Merrick Reference website (C90610 rather than C90601), were indeed prior art by reason of having been offered for sale prior to the Application, and that he had determined for that reason that he had no obligation to disclose the physical Merrick hangers (or images of those physical hangers) to the examiner.  (Sonnabend Decl. ¶¶ 5-7.)

There was a "sense of urgency" within the Plaintiff company in March 2011 about obtaining approval of the Application because Plaintiff was in the process of supplying a customer with a product that was to be protected by the '300 Patent.  (O'Connor Decl. Ex. F.) Plaintiff's representative testified that the customer had asked Plaintiff "if there was an actual patent" only a week or two before it issued.  (Id.)  On March 21, 2011, after he had filed the Amended Application, Sonnabend filed a petition to expedite examination of the Application,

apparently to facilitate legal action upon Plaintiff's claim that the Slimline Hanger infringed the

patent that the Plaintiff was seeking through the Application.  On March 23, 2011, the PTO

issued a Notice of Allowability stating in pertinent part that:

> Independent Claims 1 and 14 are allowable because the prior art fails to disclose
> two identical hangers, each having a cascade hook member and corresponding
> hole, nested together wherein when nested together a top surface of the cascade
> hook member of the second hanger is in contact with a bottom surface of the
> cascade hook member of the first hanger, a front surface of the first hanger and
> the rear surface of the second hanger are abutting against each other, and top and
> bottom portions of each hanger are in a common horizontal plane relative to one
> another.  Note that when the corresponding front and rear surfaces of the
> attachable hangers (product number C90601) of MERRICK (NPL document) are
> abutting one another, top and bottom surfaces of the cascade hook member are
> NOT abutting one another . . . .

(Id. Ex. A-12 at 2.)  The examiner's statement purporting to distinguish Plaintiff's hanger from

Merrick C90601 on the grounds that the top and bottom surfaces of the Merrick hanger do not

abut one another when nested is consistent with Plaintiff's proffer in its amendment that its

product's top and bottom cascading hook member surfaces do abut when nested,

"distinguish[ing] the claims from Arnold in view of Merrick."  (See O'Connor Decl., Ex. A-10,

at 8.)

On April 27, 2011, prior to the allowance of the '300 Patent, Defendants' counsel

sent Mr. Sonnabend a letter asserting that, contrary to the description of the Merrick C90601 in

the Notice of Allowability, the cascading hook members of Merrick's hangers do "abut and

engage the bottom surface of the other adjoining cascading hook member," (the "April 27

Letter").  Defendants' counsel noted that the "representation of record about the Merrick hanger

is inaccurate" and asserted that "applicant has an affirmative duty of candor and good faith in

dealing with the Patent Office . . . [, and] applicant should withdraw the [Application] from

issuance and disclose the misrepresentations . . . "  The April 27 Letter attached certain

high-resolution photographs of Merrick hangers that show abutting cascading hook members.

The photographs show the Merrick hangers with the product number C90610-A on the

packaging.  (Id. Ex. D.)  It is undisputed that the depicted Merrick hangers do actually feature

abutting cascade hook members.  Plaintiff did not, however, withdraw the Application or correct

the misapprehension of the PTO regarding the features of the Merrick hangers.

When questioned during his deposition as to why he did not submit the

high-resolution photographs to the PTO examiner, Mr. Sonnabend explained that he believed he

had no obligation to do so because the April 27 Letter did not specifically identify the

photographs as prior art.  (Id. Ex. B at 5-7.)  Mr. Doherty, a principal of the Plaintiff company,

testified that the only investigation the Plaintiff conducted into whether the Merrick hangers

were prior art was a call to the customer service line of Merrick; he did not disclose what, if any,

information Plaintiff received during that call.  (Id. Ex A-1)  The '300 Patent issued on May 10,

2011, without further comment from Mr. Sonnabend to the PTO examiner.  (Id. Ex. A-1.)

Defendants have offered the Report of William Poms, Esq., a former PTO

examiner, as evidence regarding the adequacy of the disclosures and the materiality of the

various references available during the prosecution of the '300 Patent.  Mr. Poms opines, inter

alia, that Mr. Sonnabend's conduct was deceptive with regard to his disclosures to the PTO.  In

his report, Mr. Poms offers the following opinion as to the likely content and impact of Mr.

Sonnabend's October 5, 2010, telephone interview with the PTO examiner:

> Aside from being persuaded by plaintiff's attorney, Mr. Sonnabend, during the
> telephone interview, the only reason for the Examiner to change his position from
> his final rejection was based on what was disclosed or shown or not shown in the
> [Merrick Reference].  These thumbnail images of the Merrick hangers were not
> high resolution pictures and it was difficult from those pictures to determine
> whether cascade hook members of the Merrick hangers were or were not in
> contact with each other when the hangers were placed next to each other in their
> packaging, or nested configuration, but there was a strong inference that they

were.

(Poms Report at 14-15.)  Mr. Poms opines that, at the time of the interview, "Sonnabend knew that Patent Examiner had reached an erroneous and completely wrong understanding of the structure of the thumbnail images of the Merrick hangers shown on the Merrick webpages" because Mr. Sonnabend was in possession of the actual Merrick hangers which had cascade hook members that abutted while in nested formation.  (Id.)  Mr. Poms concluded with respect to the interview, based on his extensive experience as a PTO examiner and patent prosecutor, that "the only way the examiner could have reached the conclusion that the hooks shown in the image were not in contact with each other was if the plaintiff's attorney told him, during their oral conversation, that the hooks were not touching."  (Id. at 17.)

Mr. Poms further opines, based on his review of the prosecution history of the '300 Patent, that the '300 Patent "would not have issued as a patent if plaintiff and particularly its lawyer, Mr. Sonnabend, had provided the Patent Examiner, prior to May 10, 2011 . . . with the physical Merrick hangers and the detailed pictures of the Merrick hangers that were in their possession."  (Id. at 20.)  Mr. Poms also asserts that, "Plaintiff, and particularly, its lawyer, Mr. Sonnabend, deliberately and willfully and in violation of the law and the Patent Office rules, withheld more detailed and pertinent prior art than the Patent Examiner had in his possession when he issued the '300 patent on May 10, 2011," despite Plaintiff's and Mr. Sonnabend's duties of "disclosure to the Patent Examiner."  (Id.)

Plaintiff contends that, since it and Mr. Sonnabend were unaware that either the physical Merrick hangers or the photographs of the Merrick hangers accompanying the April 27 Letter were prior art, they were under no duty to disclose these materials to the PTO examiner nor to correct the statement of the PTO examiner in the Notice of Allowability.  Mr. Sonnabend

specifically asserts that, because he believed the Merrick Reference and the photographs contained in the April 27 Letter were references separate and apart from the Merrick Reference, he believed he was under no duty to disclose this information to the examiner.  (Sonnabend Decl. ¶¶ 5-7.)

<u>Discussion</u>

<u>Motion in Limine to Preclude Testimony of William Poms</u>

Because the outcome of the motion to preclude might affect Defendants' ability to prevail on their summary judgment motion, it is appropriate to consider the motion to preclude prior to the parties' cross-motions for summary judgment.  <u>Briese Lichttechnik Vertriebs GmbH v. Langton</u>, 09CV9790-LTS-MHD, 2012 WL 3105083, at *2 (S.D.N.Y. July 31, 2012).  Plaintiff moves to strike Mr. Poms' Report and preclude his testimony, arguing that it is not properly admissible under Federal Rule of Evidence 702 in that it inaccurately informs the Court of the law and usurps the court's and jury's roles in determining the law and facts of this case.

Rule 702 of the Federal Rules of Evidence provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Additionally, "[a]n opinion is not objectionable just because it embraces an ultimate issue" of the case.  Fed. R. Evid. 704.

In patent cases, judges often rely on experts to determine the "disclosures of a patent, the operation of allegedly infringing devices, and the teachings of prior art."  <u>N. V.</u>

Maatschappij Voor Industriele Waarden v. A. O. Smith Corp., 590 F.2d 415, 419 (2d Cir. 1978).
"As in other fields where expert testimony is of vital significance, the opinions of patent experts
must often be formulated in conclusory terms that make reference to legal concepts or touch on
central issues in the case." Id. Experts may also testify on mixed questions of law and fact. In
re Initial Pub. Offering Sec. Litig., 174 F. Supp. 2d 61, 65 (S.D.N.Y. 2001) (citing In re Air
Disaster at Lockerbie, Scotland, 37 F.3d 804, 826-27 (2d Cir. 1994)).

Mr. Poms' testimony with regard to the propriety of the Plaintiff's conduct before
the patent office and the materiality of the omitted information to the PTO examiner's decision is
properly admissible. Mr. Poms is qualified as an expert in the patent prosecution process,
having served as both a PTO examiner and a prosecuting attorney. He has based his opinions on
the factual record before the Court, and has reliably applied his knowledge of the facts and the
law. His opinions are relevant to the adequacy of Plaintiff's disclosures to the PTO examiner,
which is a question of mixed law and fact.

Furthermore, Mr. Poms has cited, accurately, relevant principles of law. For
example, Mr. Poms recites the controlling Therasense standard for the doctrine of inequitable
conduct and notes that he is basing his opinion on that standard and the relevant facts. (Poms
Report at 12-13.) Mr. Poms also cites the well-known principle, reiterated in Rohm & Haas
Company v. Crystal Chemical Company, that intent "may be proven by a showing of acts the
natural consequences of which are presumably intended by the actor." 722 F.2d 1556, 1571
(Fed. Cir. 1983) (quoting Kansas Jack, Inc. v. Kuhn, 719 F.2d 1144 at 1151 (Fed. Cir.1983))
(internal quotation marks omitted). Plaintiff's assertion that Therasense abrogated Rohm on this
rule of law is unsupported.

Although Mr. Poms was clearly as mistaken as the parties and the Court in

characterizing the physical hangers provided to Mr. Sonnabend by Defendants' counsel as the

same models as those depicted in the brochure Merrick Reference, and it is not clear that the

physical hangers possessed by Mr. Sonnabend themselves constituted a prior reference, Mr.

Poms' affidavit provides relevant information, properly supported, as to practices of the PTO

and the examination process, and insight into the likely nature of the interaction between Mr.

Sonnabend and the examiner.  The Court may properly consider the Poms affidavit, giving it

appropriate weight, in its determination of the instant summary judgment motions.

Plaintiff's motion to strike the Poms Report and preclude Mr. Poms' testimony is

therefore denied.

The Parties' Cross-Motions for Summary Judgment

Summary judgment is to be granted in favor of a moving party if "the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 256 (1986) (the moving party bears the burden of establishing that there is no

genuine issue of material fact).  A fact is considered material if "it might affect the outcome of

the suit under the governing law," and an issue of fact is a genuine one where "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."  Rojas v. Roman

Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (quoting Anderson, 477 U.S. at

248).  The Second Circuit has explained, however, that the nonmoving party "must do more than

simply show that there is some metaphysical doubt as to the material facts" and "may not rely on

conclusory allegations or unsubstantiated speculation."  DeFabio v. East Hampton Union Free

School Dist., 623 F.3d 71, 81 (2d Cir. 2010).  Rather, the nonmoving party must come forward

with specific facts showing that there is a genuine issue for trial.  Duch v. Jakubek, 588 F.3d

757, 764 n.2 (2d Cir. 2009); see also Fed. R. Civ. P. 56(e).  When deciding cross-motions for

summary judgment, the standard to be used "is the same as that for individual summary

judgment motions and a court must consider each motion independent of the other."  Schultz v.

Stoner, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004) (internal citations and quotation marks

omitted).  The Court applies these principles in reconsidering and resolving the cross-motions

for summary judgment.

> Inequitable Conduct

"[I]nequitable conduct regarding any single claim render[s] the entire patent

unenforceable."  Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1288 (Fed. Cir.

2011).  In Therasense, the Federal Circuit clarified and heightened the standard for invalidation

of patents based on inequitable conduct on the part of a prosecuting attorney.  It held that, where

the withholding of a reference is the basis of an inequitable conduct challenge, a defendant must

prove by "clear and convincing evidence" that the applicant "knew of the reference, knew it was

material, and made a deliberate decision to withhold it."  Therasense, Inc. v. Becton, Dickinson

& Co., 649 F. 3d 1276, 1290 (Fed. Cir. 2011) (en banc).  "[I]ntent and materiality are separate

requirements."  Aventis Pharma S.A. v. Hospira, Inc., 675 F.3d 1324, 1334 (Fed. Cir. 2012)

(quoting Therasense, 649 F. 3d at 1290) (quotation marks omitted).  "[A] district court may not

infer intent solely from materiality.  Instead, a court must weigh the evidence of intent to deceive

independent of its analysis of materiality."  Id. at 1290.  "Because direct evidence of deceptive

intent is rare, a district court may infer intent from indirect and circumstantial evidence."  Id.

(citation omitted).  "However, to meet the clear and convincing evidence standard, the specific

intent to deceive must be 'the single most reasonable inference able to be drawn from the

evidence.'"  Id. (citation omitted).  The burden of coming forward with clear and convincing

evidence of deceitful intent is on the party alleging inequitable conduct: "the 'patentee need not offer any good faith explanation unless the accused infringer first . . . prove[s] a threshold level of intent to deceive by clear and convincing evidence.'" Id. at 1291 (citation omitted). Here, Plaintiff asserts that it is entitled to summary judgment on the issue of inequitable conduct because Defendant has failed to come forward with the requisite clear and convincing evidence and, furthermore, alleges that Plaintiff's decision not to disclose information concerning the physical hangers was made in good faith.

Patent prosecution is an ex parte process and, consequently, "[p]ublic interest demands that all facts relevant to such matters be submitted formally or informally to the Patent Office, which can then pass upon the sufficiency of the evidence. Only in this way can that agency act to safeguard the public in the first instance against fraudulent patent monopolies." Gen. Elec. Co. v. Mitsubishi Heavy Indus. Ltd., 10CV276-F, 2013 WL 2338345 (N.D. Tex. May 28, 2013) (quoting Precision Instrument Mfg. Co. v. Auto. Maintenance Mack Co., 324 U.S. 806 (1945)). The Supreme Court has adopted the reasoning of the PTO that "the nature of an application for patent, [and] the relationship of attorneys to the Patent Office requires the highest degree of candor and good faith. In its relation to applicants, the [PTO examiner] must rely upon their integrity and deal with them in a spirit of trust and confidence." Kingsland v. Dorsey, 338 U.S. 318, 319 (1950) (quoting statement made by the Patent Office Committee on Enrollment and Disbarment) (ellipses and internal quotation marks omitted). This duty of candor is codified in 37 C.F.R. § 1.56(a) as follows:

> Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [PTO examiner], which includes a duty to disclose to the [PTO examiner] all information known to that individual to be material to patentability . . . .

A "[v]iolation of the duty of candor constitutes inequitable conduct."  Avocent Redmond Corp. v. Raritan Americas, Inc., 921 F. Supp. 2d 229 (S.D.N.Y. 2013).

Materiality

Under Therasense, the materiality required to establish inequitable conduct in the prosecution of a patent is but-for materiality – a defendant must show by a preponderance of the evidence that the PTO examiner would not have allowed the claim but for the non-disclosure or misrepresentation – and the Plaintiff or its attorney must have known that the reference was material.  649 F. 3d at 1292, 1295.  The defendant must prove that the patentee had a "specific awareness of materiality;" general knowledge or negligence in not recognizing the materiality of the misrepresentation or omission will not suffice.  Therasense, 694 F.3d at 1375.

The materiality of the Merrick Reference cannot genuinely be disputed.  Although Mr. Sonnabend claims that he originally revealed the brochure Merrick Reference out of an abundance of caution, unsure of whether it predated the Application, the PTO's confirmation of its pre-Application date, and the citation of the Merrick Reference in the PTO's original rejection of the Application, left no room for doubt as to the materiality of that brochure reference.  Equally clear is the materiality of the PTO's interpretation of the brochure Merrick Reference as a depiction of a hanger constituting prior art in relation to the Application.  Information forming the basis of the PTO's understanding of the physical relationships of the Merrick hangers in their nested configuration is shown in the record, by clear and convincing evidence, to be but-for material to the PTO's decision to grant the '300 Patent.  Mr. Poms' expert affidavit provides further confirmation of the centrality of the examiner's understanding of the attachment feature of the hanger product to the decision to issue the patent.

Intent to Deceive the PTO Examiner

Equally clear and convincing is the record evidence that Mr. Sonnabend had, and provided to the PTO examiner, information regarding those physical relationships.  The examiner rejected the Application, citing Merrick specifically as prior art vitiating several of Plaintiff's claims.  Shortly thereafter, Mr. Sonnabend spoke with the examiner on the telephone, and that same day submitted an amended application purporting to distinguish the Plaintiff's hanger from Merrick, representing that the Merrick hangers did not abut top-and-bottom when in a nested configuration but that Plaintiff's did.  There is nothing in the prosecution history indicating that the examiner had obtained any independent information regarding the properties of the physical Merrick hangers.  By contrast, Mr. Sonnabend admits that he had physical Merrick hangers at the time.  He claims to have forgotten what transpired in the telephone conversation.  He is certain, however, that he never shared accurate information regarding the Merrick hangers and photographs provided to him by the Defendants with the examiner.  The only reasonable interpretation of the circumstantial evidence concerning the October 12, 2010, conversation with the examiner is that Mr. Sonnabend misrepresented to the examiner the physical properties of the actual Merrick hangers in his possession – specifically, that he told the examiner or deliberately let the examiner believe that the tops and bottoms of the Merrick cascade hooks did not abut in the nested configuration.  Such intentional deception of the examiner is grounds for invalidation of the '300 patent.

Proof of inequitable conduct requires clear and convincing evidence of a specific intent to deceive the PTO examiner.  Therasense, 649 F.3d at 1290.  To satisfy the intent element, the accused infringer must demonstrate that the specific intent to deceive is "the single most reasonable inference able to be drawn from the evidence."  Therasense, 649 F. 3d at 1297

(quoting Star Scientific Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed. Cir.2008))

(internal quotation marks omitted).  "'Because direct evidence of deceptive intent is rare, a

district court may infer intent from indirect and circumstantial evidence' on a motion for

summary judgment or after a trial."  Jersey Asparagus Farms, Inc. v. Rutgers Univ., 803 F. Supp.

2d 295, 312 (D.N.J. 2011) (quoting Therasense, 649 F. 3d at 1290).  Selectively withholding

material information is indicative of an intent to deceive for the purposes of inequitable conduct.

Aventis Pharma S.A. v. Hospira, Inc., 675 F.3d 1324, 1335 (Fed. Cir. 2012).

The Court finds that the only reasonable inference to be drawn from the

undisputed facts is that Mr. Sonnabend intended to deceive the PTO examiner about a reference

he knew was material and that he in fact did so.  It is undisputed that Mr. Sonnabend had a

telephone interview with the PTO examiner, after which he filed the Amended Application

which distinguished the Application from the Merrick Reference on the basis of non-abutment of

the cascade hooks of the hangers portrayed in the Merrick Reference.  It is also apparent that the

top and bottom surfaces of the cascade hook members of the Merrick hangers do in fact abut

when nested, and that Mr. Sonnabend had Merrick hangers in his possession at the time he spoke

to the PTO examiner.  Logic dictates the conclusion that Mr. Sonnabend misrepresented the

cascade hook feature of the Merrick hangers to the PTO examiner in the telephone conversation,

rendering the examiner receptive to the Amended Application, which draws a false distinction

between Plaintiff's hangers and the Merrick Reference.[3]

Plaintiff offers no evidence to controvert Mr. Poms' conclusion that "the only

---

[3]    In the Amended Application, Mr. Sonnabend wrote that Claims 1 and 14 of the
Application have been amended to include abutting cascading hook members in
order to "distinguish[] the claims from Arnold in view of Merrick."

way the examiner could have reached the conclusion, which is consistent with the foregoing

analysis, that the hooks shown in the image were not in contact with each other was if the

plaintiff's attorney [Mr. Sonnabend] told him, during their oral conversation, that the hooks were

not touching." Rather, when given the opportunity, Mr. Sonnabend testified only that he had no

memory of any of the details discussed during the interview.

Mr. Sonnabend's continued pattern of disingenuous behavior, even after filing the

Amended Application, strengthens the inference of his intent to deceive the PTO examiner. Mr.

Sonnabend proffers that he originally disclosed the low-resolution Merrick Reference out of "an

abundance of caution" even though he did not know whether it was prior art. Even after the

PTO examiner had determined that the Merrick Reference constituted prior art, and Mr.

Sonnabend had led the examiner to an incorrect conclusion about the Merrick hangers and

amended the Application to turn on that incorrect conclusion, Mr. Sonnabend did not disclose

either the physical Merrick hangers or the high-resolution photographs of the C90610 Merrick

hangers (both far clearer demonstrations of how the hanger worked than the thumbnail images in

the Merrick Reference) after Defendants' counsel provided them to him. Mr. Sonnabend now

claims that he did not do so because he did not know that they themselves were prior art. Mr.

Sonnabend selectively withheld from the PTO examiner the most relevant information

concerning the physical attributes of the hanger product depicted in the reference that Mr.

Sonnabend provided to the PTO examiner, which is indicative of a clear intent to deceive. See

Aventis Pharma S.A. v. Hospira, Inc., 675 F.3d at 1335 (court found inequitable conduct based

on "affirmative conduct by the applicants showing not only specific awareness of materiality,

but careful and selective manipulation of where, when, and how much of the most material

information to disclose"). His sophistry concerning the logic underlying his behavior is

insufficient, in light of the compelling circumstantial evidence that he provided false information to the examiner, to frame a genuine issue of material fact regarding his intent to deceive the examiner.

Mr. Sonnabend's contention that he could properly withhold, on grounds of uncertainty as to prior art status, physical evidence of critical features of hangers similar if not identical to those depicted in his disclosed prior art reference, while misleading the examiner as to the nature of those features in order to obtain a patent, is wholly incredible and indicates inequitable conduct at its worst. Plaintiff's argument that it could properly withhold the physical embodiments of referenced prior art is baseless. In American Calcar, Inc., v. American Honda Motor Co., the Federal Circuit upheld a determination that a similar strategy rendered a patent invalid due to inequitable conduct, finding that an inventor's disclosure of the prior art in the form of a manual for a navigation system – which system the inventor had used while developing the device that he sought to patent – but failure to disclose the operational details of the actual navigation system including photographs of the navigation system itself, indicated a specific intent to deceive under Therasense. 768 F.3d 1185, 1191 (Fed. Cir. 2014). Here, Mr. Sonnabend prosecuted the patent in much the same way, offering the low-resolution photographs wherein the abutting cascade hooks are not visible, but failing to disclose either the physical Merrick Hangers or higher resolution photographs, in order to lead the PTO examiner into allowing his Claims 1 and 14 based on the false representation that the hangers depicted in the Merrick Reference did not have abutting cascading hooks.

Accordingly, there is no genuine dispute of material fact. Defendants have, furthermore, carried their burden of demonstrating by clear and convincing evidence that Plaintiff deliberately misled the PTO as to the key structural feature of the hangers depicted in

the Merrick Reference and withheld photographs and physical evidence that would have precluded the issuance of the '300 Patent.  Defendants have thus proven but-for materiality of the reference and of Mr. Sonnabend's misrepresentations and withholding of crucial information concerning Merrick's attachable hanger products.  The undisputed evidence of record is also sufficient to require the conclusion that Plaintiff specifically intended to deceive the PTO examiner as to the key structural feature of the hangers depicted in the Merrick Reference.  Mr. Sonnabend's proffer as to his belief that he had no legal obligation to disclose the physical hangers and the high-resolution photographs does not raise any triable issue of fact as to his intent to deceive the PTO as to a material matter, and the impact of that deception on the issuance of the '300 Patent.

Defendants are, accordingly, entitled as a matter of law to judgment declaring the '300 Patent invalid as procured through inequitable conduct, and Plaintiff's cross-motion for summary judgment must be denied.  In light of the invalidation of the '300 Patent, Plaintiff's infringement claims must be dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for reconsideration is granted and, upon reconsideration, Defendants' motion for summary judgment of non-infringement is granted and the '300 patent is declared invalid and unenforceable as the product of inequitable conduct. Plaintiff's claims of infringement are dismissed.  Plaintiff's motions for summary judgment and to strike the testimony of William Poms are denied in their entirety.  This Memorandum Opinion and Order resolves docket entry no. 232, nunc pro tunc to September 30, 2013, and supersedes docket entry no. 225.

Plaintiff's opposition to Defendants' application for attorneys' fees must be filed within 14 days after entry of this Memorandum Opinion and Order.  (See docket entry nos. 235 and 241.)

SO ORDERED.

Dated: New York, New York
        February 11, 2015

                                                          /s/ Laura Taylor Swain
                                                          LAURA TAYLOR SWAIN
                                                          United States District Judge

## PROOF OF SERVICE

I certify that, on June 3, 2015, I caused the BRIEF OF MOVANT-

APPELLANT JEFFREY SONNABEND to be filed with the United States Court

of Appeals for the Federal Circuit and served a copy on counsel of record by

operation of the Court's ECF system.

Dated: June 18, 2015

_____
Jeffrey Sonnabend

# CERTIFICATE OF COMPLIANCE

I hereby certify under Fed. R. App. P. 32(a)(7) that this brief is proportionately spaced, has a typeface of 14 points, and contains no more than 10,970 words according to the word count of OpenOffice Writer, which was used to prepare this brief.

Dated: June 18, 2015

_____
Jeffrey Sonnabend